SILAS Q. PERRY

*v.*

JAMES H. PEARSON *et al.*

*Filed at Ottawa October 31, 1890.*

1.   CONTRACTS—*mental capacity.* Mental weakness which will justify a court of equity in setting aside a contract or deed, must be such as renders a party incapable of understanding and protecting his own interests.   The contract or deed will be permitted to stand, notwithstanding the fact that the intellectual powers of one of the parties to it have been somewhat impaired by age or disease, if it appears that the contracting party retains a full comprehension of the meaning, design and effect of his acts.

2.   The question in such cases is, whether or not the party alleged to be affected with mental weakness is capable of transacting ordinary business, or of acting rationally in the ordinary affairs of life.   The burden of proof is upon the party alleging the mental incapacity, to prove the same by a preponderance of the evidence.

3.   Although a person's mind may have been impaired by disease, or by anxiety about his financial condition, yet if he is capable of transacting ordinary business, and understands the nature of the business in which he is engaged, and the effect of what he is doing, and can exercise his will in reference thereto, he will be capable of making a valid and binding contract.

4.   RESCISSION OF CONTRACT—*in equity—for inadequacy of consideration.*   Mere inadequacy of price, unaccompanied by other inequitable incidents, will not justify a court of equity in setting aside a sale or contract.   The cancellation upon that ground will only be decreed when the inadequacy of price is so gross that it shocks the conscience, and furnishes satisfactory and decisive evidence of fraud.

5.   Where the parties to a contract knowingly and deliberately fix upon the price of property sold, each having equal facilities for know-

ing its value, and there being no misrepresentations or concealment of facts, the courts will not interfere to avoid the contract, however great or small the price they may have fixed.

6. SAME—*waiver of right to rescind—delay in asserting right.* In case a party desires to rescind a sale upon the ground of fraud, he must not remain silent after knowledge of the fraud, and continue to treat the property taken in payment as his own, or to receive the benefits of the trade he has made. If he does so, he will be held to have waived his objections, and will be bound by the contract, as if the fraud had not occurred.

7. CORPORATIONS—*stockholders—duty to pay debts of the corporation.* In the absence of an agreement to that effect, a stockholder in a corporation is under no legal obligation to pay the corporate debts out of his individual means.

8. SAME—*stockholders and directors—trust relation between them.* As the value of the shares of the stockholders, and their rights in connection therewith, are affected by the conduct of the directors of a corporation, a trust relation is created between them. The directors may not be allowed to manage the business of a corporation so as to lessen the value of the stock, for the purpose of buying in the stock at a low price.

9. SAME—*contract between directors of corporation—for sale of stock.* A contract between two directors of a corporation, who are both stockholders, for the sale of the stock of the one to the other, is not voidable merely on account of any trust relations between the parties.

10. RELEASE OF MORTGAGE — *as to parcels — on partial payments.* Where a mortgage provides that the mortgaged premises shall be released as fast as the several debts secured thereby shall be paid, a demand on the mortgagee to release property under such provision should state some definite or particular part of the property sought to be released.

APPEAL from the Appellate Court for the First District ;— heard in that court on appeal from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

Mr. SIDNEY SMITH, and Mr. THOMAS DENT, for the appellant :

As to the gross inadequacy of the price of the stock sold, see 2 Pomeroy's Eq. Jur. secs. 926, 927; *Morse* v. *Royal,* 12 Ves. 373; *Macoupin County* v. *People,* 58 Ill. 191; *Madison County* v. *People,* id. 456.

Appellees used the mortgage to get control of the property. Courts will look with distrust upon an arrangement for the

transfer of the equity of redemption to the mortgagee. 2 Jones on Mortgages, sec. 1042; *Brown* v. *Gaffney*, 28 Ill. 149; *Russell* v. *Southard*, 12 How. 139; *Allore* v. *Jewell*, 4 Otto, 506.

As to the weakness of appellant's mind as a ground for setting aside his contract, see 1 Story's Eq. Jur. sec. 234; *Tracey* v. *Sacket*, 1 Ohio St. 54; *Ellis* v. *Mathews*, 19 Texas, 390; 2 Kent's Com. 451; 2 Pomeroy's Eq. Jur. sec. 947.

As to the confidential or trust relations of the parties, see 2 High on Injunctions, (2d ed.) sec. 1351; Lindley on Partnership, (5th Eng. ed.) *303, 304; Bigelow on Frauds, 191; 6 Coldw. 441.

As to weakness of mind and undue influence, see 2 Pomeroy's Eq. sec. 951; *Dennett* v. *Dennett*, 44 N. H. 531; *Jackson* v. *King*, 4 Cow. 219; Lewin on Trusts, secs. 496, 497.

Messrs. DUNCAN & GILBERT, also for the appellant.

Mr. WILLIAM W. FARWELL, for the appellees:

Equity requires that a person entitled to set a transaction aside on the ground of mistake, fraud or disability, shall speak when he discovers his rights and is able to insist upon them, or ever after remain silent. *Grymes* v. *Sanders*, 3 Otto, 62; 2 Wharton on Evidence, sec. 1017, note 3.

The bill in a case like this should show when the complainant first became aware of the alleged facts upon which he founds his alleged rights and commences suit. *Badger* v. *Wallace*, 2 Wall. 95; *Sullivan* v. *Railroad Co.* 94 U. S. 811.

A person who has a right to treat a contract as voidable by him, has but one election,—to rescind the same. If he once affirms it, that is the end of his election. Bigelow on Frauds, p. 436, and cases there cited; *Kinney* v. *Kiernan*, 49 N. Y. 164; *Morris* v. *Rexford*, 18 id. 559.

His affirmance may consist of positive acts, as, retaining and enjoying the use or receiving the rents of real estate, with the prospect or probability of its advancing in value; or it may consist in remaining silent, and allowing the other party

to do anything which would materially benefit the one party or injure the other if. the contract should afterwards be set aside. Bigelow on Frauds, 437; 10 Bacon's Abridgment, 141 ; *Bronson* v. *Wiman,* 10 Barb. 430.

A transaction which is capable of being rescinded on the ground of fraud, is to be treated as good until rescinded, and not as bad until confirmed. Such a transaction is not to be considered as rescinded only as of the date of the decree of the court setting the transaction aside, but as of the date of the unequivocal and open declaration of the injured party that he demands a rescission, followed up, on a refusal, by a prompt application to the courts. Bispham's Eq. sec. 472, and cases there cited ; *Oakes* v. *Turquand,* L. R. 2 H. L. Cases, 325.

Mr. JOHN N. JEWETT, also for the appellees.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

This is a bill, filed in the Superior Court of Cook County on April 22, 1886, by the appellant Silas Q. Perry against the appellees James H. Pearson, Eugene H. Pearson and Granger Farwell for the purpose of setting aside a sale, made by the appellant on November 24, 1884, to the said James H. Pearson, of stock to the amount of $357,500.00 in the "Perry-Pearson Company," a corporation organized under the laws of the State of Michigan to carry on the business of manufacturing lumber, lath, shingles, etc., and transporting and marketing the same, and, for such business, to acquire lands, timber, logs and mills, logging railroads, vessels, etc. The prayer of the bill is, that the defendants be required to re-assign to complainant the stock and property interests in said company and to account for the profits and income therefrom, or to account for the value of such interests in case the same have been parted with.. The cause was heard upon bill, answer, replication and proofs oral and documentary, resulting in a final decree on February 8, 1888, dismissing the bill for want

of equity. This decree has been affirmed by the Appellate Court whose action in this regard is brought before us, for review, by appeal.

The articles of incorporation bear date December 12, 1882, and are signed by Perry and the two Pearsons; they recite that the capital stock is $650,000.00, divided into 26,000 shares of $25.00 each, and is fully paid up, that Perry owns 14,400 shares, James H. Pearson 11,000 shares, and Eugene H. Pearson 600 shares, that the business is to be managed by a board of directors consisting of three stockholders, which number may be increased to nine at any annual meeting of the stockholders by two thirds vote, that directors shall be stockholders, that the business shall be carried on in certain counties in Michigan, that the place of business and business office in Michigan shall be located at Saginaw, and that there is "to be established an office for the transaction of business of the corporation, and for the holding of the meetings of the stockholders and directors in Chicago."

When the company was organized appellant owned about 30,000 acres of pine lands on or near the Manistique river in Michigan, and other lumbering interests including a saw mill nearly completed, and lands and buildings near the mill, and a log railway connected therewith, and a quantity of logs and horses, oxen, wagons, etc., and other personalty. These lands and the mill and the other property were then estimated to be worth $514,989.93 and were transferred to the Company at that valuation. At the same time appellant owed $153,134.80, at least $40,000.00 of which was secured by mortgage on said lands. This indebtedness was assumed by the company, and after deducting the amount of it from $514,989.93 there was left the sum of $361,855.13 as the estimated value of the interests transferred to the company by appellant. Appellant paid no money into the corporation, and, in exchange for the $361,855.13, received $360,000.00 in stock and a credit of $1855.13.

At the same time James H. Pearson was the owner of certain pine lands on or near the same river, and lumber camps and logging outfits thereon, and some other property, all of which was estimated to be worth $256,677.03 and was transferred to the company at that figure. He owed $56,677.03 secured by mortgage on his lands. This indebtedness was assumed by the company, leaving $200,000.00 as the estimated value of the property interests transferred to the company by James H. Pearson and his son, Eugene H. Pearson, the latter having an interest in said property amounting to about $15,000.00. James H. Pearson, who was a man of large means independently of what he put into this company, also furnished to the company, in money and in his individual notes, $90,000.00, making his total contributions $290,000.00, for which stock to the amount of $275,000.00 was issued to him and to the amount of $15,000.00 to his son, Eugene H. Pearson.

Upon the organization of the company, by-laws were adopted providing that the officers should be a president, vice-president and secretary and treasurer; salaries to be fixed by the board of directors; and the president to "have the general management, care and control of the business of the corporation so far as looking after and directing the same were concerned, and should appoint and employ agents, mechanics and other laborers." The complainant, Perry, was elected president, James H. Pearson vice-president, and Eugene H. Pearson secretary and treasurer, and these three constituted the board of directors, and they continued to hold such positions respectively from December 12, 1882, to November 24, 1884.

At the latter date Perry owned $357,500.00 of the stock, and sold and transferred it to James H. Pearson and surrendered his offices of president and director, in consideration of which James H. Pearson conveyed to Perry his homestead on Washington boulevard in Chicago valued at $15,000.00, and the undivided one half of a water-lot in Chicago valued at $16,500.00, and also executed to Perry an indemnifying bond

in the penal sum of $100,000.00 to hold him harmless against the debts of the company for which he was personally liable, to-wit: a note for $10,000.00 executed by Perry to one Longley in 1881, due October 20, 1885, also a note for $30,000.00 executed by Perry to Longley in 1881, and due July 1, 1885, also about $60,000.00 of the company's paper which had been guaranteed by Perry and James H. Pearson, also a claim of about $7198.00 by the company against Perry for an alleged deficiency in the quantity of logs originally transferred by him to the company in exchange for his stock, also a claim of the company of about $1400.00 against Perry for amount overdrawn by him. The notes given by Perry to Longley in 1881 had been assumed by the company upon its organization.

Various reasons are urged by the appellant in favor of the claim that the sale of his stock on November 24, 1884, should be set aside.

*First,* it is said that Perry was incapable of making a sale of the stock by reason of the impairment of his mental faculties through illness and trouble. It is urged that the weakness of his mind at the time of the sale made him an easy victim of imposition.

Mental weakness, which will justify a court of equity in setting aside a contract or deed, must be such as renders a party incapable of understanding and protecting his own interests; the contract or deed will be permitted to stand, nothwithstanding the fact that the intellectual powers have been somewhat impaired by age or disease, if it appear that the contracting party retains a full comprehension of the meaning, design and effect of his acts. The question in such cases is, whether or not the party alleged to be affected with mental weakness is capable of transacting ordinary business, or of acting rationally in the ordinary affairs of life. (*Lindsey* v. *Lindsey,* 50 Ill. 79; *Meeker* v. *Meeker,* 75 id. 260; *McCarty* v. *Kearnan,* 86 id. 291; *Pickerell* v. *Morss,* 97 id. 220; *English* v. *Porter,* 109 id. 285.)

The complainant below produced a large number of witnesses who testified as to his mental condition in the fall of 1884. They speak of his being nervous, worried and excited; some say that he appeared to be broken down, worn out and shattered in health; several refer to the facts that his voice trembled, that he had sometimes a wild, dazed look in his eyes, that he was restless in his sleep, that he talked in a loud and excited manner, seeming to dread some impending calamity and saying that he was in the power of men who were trying to ruin him; that he was depressed in spirits, despondent and irritable; most of these witnesses attribute the peculiarities, which they noticed in the complainant, to the pressure upon his mind of business cares and troubles. At this time the Perry-Pearson company was largely in debt; many of its obligations were about to mature and there was little or no prospect of renewing or extending them; the business for some time past had been a losing one. Unquestionably these matters had a serious effect upon the mind and spirits of the complainant, but, after a careful analysis of the evidence of his own witnesses, we see nothing in it to indicate anything more than the intense anxiety, and perhaps agony, which a naturally sensitive and nervous man of business might suffer from the anticipation of financial ruin.

On the other hand, the defendants below produced a large number of witnesses, many of whom had known complainant for years, and had had business transactions of various kinds with him, and who give it as their opinion that he was mentally capable of making sale of his stock and of fully understanding the meaning of his act in so doing. Two of these, who had known him for seventeen years, say that he was a diffident and reticent man, that he had always had a sort of nervous hesitancy in his speech and a tremulousness in his voice and a shaking of the hands, that his voice was peculiar, and he created the impression, when about to express himself, that he was in distress and was ready to cry or break down, but

15—135 ILL.

these witnesses say that the peculiarities thus specified were no more marked in the fall of 1884 than they had been for years prior to that time.

The testimony of the defendants upon this subject is confirmed by the conduct of the complainant himself during the period in question. In the early part of October, 1884, Perry and the Pearsons had some negotiations with one Rathborne, by the terms of which Rathborne was to put $150,000.00 into the company and take $258,275.00 of its stock, to be contributed in the proportions of $143,050.00 by Perry and $115,-225.00 by J. H. and E. H. Pearson. These negotiations were conducted mainly by Perry himself. He went to the Manistique river with Rathborne to show him the property, and the testimony shows that, although he appeared nervous and worried during these negotiations which finally fell through, he had a perfectly intelligent comprehension of all that was done or that was proposed to be done.

Later in the same month of October Perry entered into a contract with J. H. Pearson for the sale of his stock to the latter in exchange for a saw-mill in Saginaw, and other property. He afterwards repudiated the contract, which was in writing, but he understood very well what he was doing when he signed it. Such is the testimony of the party who drew the contract, and of several others who were present at its execution. By its terms the Pearsons were to permit him to remain in charge of the business of the Perry-Pearson Company for a month. On November 8, 1884, he acknowledged the execution of a deed of the company signed by himself as its president, and conveying certain lands in Michigan; the commissioner, who took the acknowledgment, swears that he saw no evidence of any want of capacity to transact business. In the sale finally made on November 24, 1884, he showed not only capacity, but shrewdness, in insisting that the property transferred to him should be free from incumbrance, and

that he should be amply indemnified against liability for the debts of the company.

The burden was upon the complainant to prove his mental incapacity by a preponderance of evidence. (*English* v. *Porter, supra.*) He has not done so. Even though it should be admitted that on November 24, 1884, his mind had been impaired by disease, or by anxiety about his financial condition, yet we are satisfied, from an examination of the testimony, that he was capable at that time of transacting ordinary business, and understood the nature of the business in which he was then engaged, and the effect of what he was doing, and could exercise his will in reference thereto. This being so, there was no such mental incapacity as would justify a cancellation of the sale of the stock. (*English* v. *Porter, supra.*)

*Second,* it is said that a certain species of fraud and imposition was practiced upon the complainant, as a result of which he was induced to part with his stock at an inordinately low figure. It is claimed that his fears were worked upon, and that advantage was taken of his necessities, and that certain relations between himself and the defendants, which are alleged to have been of a confidential nature, were abused and made use of to blind him to his true condition.

One of the circumstances referred to as establishing the fraud charged against the defendants is the alleged inadequacy of the consideration received for the transfer of the stock. After the purchase of the complainant's stock on November 24, 1884, the name of the corporation was changed to that of the North Shore Lumber Company. James H. Pearson gave his son, Eugene H., $85,000.00 of the stock, which, with the $15,000.00 already owned by him, made him the owner of $100,000.00 of stock. James H. also sold $50,000.00 of the stock at twelve and a half cents on the dollar to Granger Farwell, one of his partners in the firm of J. H. Pearson & Co. engaged in the lumber business at Chicago. At the stockholders' meeting in January, 1885, the Pearsons and Farwell

were elected directors, and James H. Pearson was elected president, Farwell vice-president, and Eugene H. Pearson secretary and treasurer. On January 4, 1886, the North Shore Lumber Company sold all its property to Hall & Buell of New York for $510,000.00, $100,000.00 in cash and the balance payable in sums of $50,000.00 and $55,000.00 at certain intervals between January, 1886, and January, 1889. At the time of the sale to Hall & Buell, the Company owed over $210,000.00, which amount was paid at once, leaving about $300,000.00 in notes to be divided between the three stockholders. Appellant claims, that he is entitled to such proportion of this sum of $300,000.00, towit: an amount somewhere between $135,-000.00 and $165,000.00, as represents the profit made by the sale to Hall & Buell on the stock sold by him to James H. Pearson on November 24, 1884. At the latter date, he received, for his stock, $31,500.00 in property, and indemnity against his personal liability on debts amounting to about $100,000.00, which debts were all paid in full at or before the time of the sale to Hall & Buell. The inadequacy of the consideration is stated to be the difference between what he so received in November, 1884, and the sum of $135,000.00 or thereabouts so realized in January, 1886.

Mere inadequacy of price, unaccompanied by other inequitable incidents, will not justify a court of equity in setting aside a sale or contract. The cancellation will only be decreed where the inadequacy of price is so gross that it shocks the conscience, and furnishes satisfactory and decisive evidence of fraud. (2 Pomeroy's Eq. Jur. secs. 927 and 928.) On November 24, 1884, the stock of the Perry-Pearson Company had no market value, and, in view of the situation and surroundings of the company and its property at that time, it is difficult to say what the real value of the stock then was. The company began its career on December 12, 1882, with an indebtedness of $209,811.83. Its indebtedness in November, 1884, was not less than $175,000.00, much of which was then ma-

turing, and, under its re-organization after the appellant had
sold his stock, the indebtedness had again risen to more than
$210,000.00 in January, 1886. According to the testimony
of the book-keeper, the losses in the business of the company
in 1883 were $40,000.00 and in 1884 nearly $60,000.00. The
real property of the company was subject to mortgages of
upwards of $140,000.00.

The mill was situated some distance from the Manistique
river, and the logs cut from the timbered lands of the company
were floated down to a point near the mouth of the river, raised
by "pull up" works from the river and placed on a railroad
by which they were conveyed westward to the mill; and the
timber manufactured at the mill was again carried on the rail-
road to the river and thence shipped to the market. If the mill
had been on the river, the construction of the railroad and
"pull up" works would have been unnecessary. The mill seems
also to have been of an inferior kind. At any rate, the mill
and its improvements, either from their location or for some
other cause, demanded large outlays of money, and the profit-
ableness of the business was thus interfered with. The mill
was not completed on December 12, 1882. Prior to that time
Perry had spent on the mill and other improvements about
$100,000.00; the Perry-Pearson Company spent $80,000.00;
the North Shore Lumber Company $15,000.00 and Hall &
Buell $45,000.00.

But the proof shows that the property increased in value
between November, 1884, and January, 1886. The amount
of pine stumpage upon the lands in November, 1884, was
about 145,000,000 feet. In 1885 the money market became
easier; lumber commanded better prices; there was an in-
quiry for pine lands. According to the testimony of Hill, a
large owner of such lands, and experienced in the lumber busi-
ness, and who seems to be a disinterested witness, there was an
advance of $1.25 per thousand feet in pine stumpage between
November, 1884, and January, 1886. This would make the

advance on 145,000,000 feet $181,250.00. After making allowance for the natural increase in value, and for the expenditures in 1885 on the mill and in the business, the profit made by appellees on the sale to Hall & Buell would not appear to be unreasonably large. The proportion of the amount realized on the stock sold by appellant would not greatly exceed what he received in November, 1884, especially when we take into consideration the services of the appellees in conducting the business in 1885, and providing for the payment of the guaranteed paper as it fell due. A careful analysis of the evidence does not reveal any such gross inadequacy of price as furnishes satisfactory and decisive evidence of fraud.

But let it be admitted that appellant's stock was sold for much less than it was worth. He made the sale with his eyes open. He seemed to be willing to part with his stock at a low figure rather than run the risk of being held liable for the debts of the company. No misrepresentations were made to him. He was as well acquainted with the value of what he was selling as were those who purchased from him. Whenever it appears that the parties *knowingly and deliberately* fixed upon any price, however great or however small, there is no occasion nor any reason for interference by courts, for owners have a right to sell property for what they please, and buyers have a right to pay what they please. (2 Pomeroy's Eq. Jur. sec. 927, note 3 and cases cited.)

Between 1871 and 1875 Perry entered and bought at government prices 21,000 acres of the 30,000 acres of land transferred by him to the Perry-Pearson Company after having them explored and the timber upon them estimated. Included also in the 30,000 acres were certain lands amounting to more than 6000 acres, known as the "Rust" lands, which he had purchased after having them "re-looked" by Matthew Gunton, one of his own men. He also purchased other lands, making up the 30,000 acres, before December, 1882. Before that time he had started logging camps upon these lands. Of the lands

put into the company by James H. Pearson, 7000 acres had been bought by Pearson from Perry himself, and 7000 acres more from parties associated with Perry in entering, exploring and estimating the lands. Pearson had bought some of the "Rust" lands upon the strength of the "relooking" done by Perry's man. Some other lands at the head waters of the Manistique river transferred to the company by Pearson had been examined by Perry before the company was organized. Therefore, it cannot be said that Perry did not know the full value of all the lands owned by the company when he sold his stock. He had been for many years in the lumber business and was familiar with such matters.

As to the mill and the improvements connected therewith, their construction had been begun and prosecuted by Perry, and they were under his supervision and management. He knew their cost and their value.

Appellant was a director in the company and its president from the time of its organization to the time of his retirement in November, 1884. We have already seen that as president he had the general management and control of the business. The proof shows beyond question, that Perry was as well acquainted with the affairs of the corporation as was either of the Pearsons. He knew what the debts were and when they matured, what facilities the company had for raising money and what its resources were, what business it had done and whether such business had been successful or not. As has already been stated, appellant early in October, 1884, had had certain negotiations with a capitalist and lumber dealer by the name of Rathborne with a view to the sale of some of the stock to him, and had revisited and reexamined much of the company's property, and had had the benefit of Rathborne's views as to its value. He had also annulled a contract made on October 21, 1884, for the sale of his stock to J. H. Pearson, and, having done so upon the advice of friends as to its supposed unfairness, he was thereby put on his guard and.

warned to carefully consider the question of the value of his stock.

Under all these circumstances we cannot see how appellant could have been overreached by the appellees in the matter of fixing the price at which the stock was sold, so far as the fixing of such price depended upon knowledge of all the data and elements that went to make up the value of the stock.

But it is said that the Pearsons refused to make advances to the company, and underrated its resources to outsiders so as to prevent a favorable sale, and so managed its finances as to injure its credit and standing, and presented the prospects of the company to Perry in a doleful light, and that they did this for the purpose of forcing him to surrender his stock at a low figure.

The first circumstance referred to in support of this contention is the execution of a mortgage on November 8, 1883, by the company to James H. Pearson and Eugene H. Pearson. The mortgage does not specify any particular amount, but recites that it is given to save the mortgagees harmless against any endorsements, theretofore made or thereafter to be made by them, of any of the company's notes, drafts or commercial paper. The mortgage covered about 8500 acres of pine lands, the mill and its improvements, the railroad, docks and about 1600 acres of land near the mill. Perry opposed the making of this mortgage on the ground that it was given by the company to two of its own directors and would for that reason be subject to criticism by the creditors. At a meeting of the directors the resolution providing for its execution was voted for by the two Pearsons; Perry did not vote, but he signed the mortgage as president of the company; it was drawn up by Morrill, the book-keeper, under his direction; it was supposed, at the time, that it covered the "pull up" works for lifting the logs from the river to the railroad cars, but it was afterwards discovered that these works were not embraced, thereby reducing the value of the mill property about one third;

the 8500 acres were part of the lands that had been transferred to the company by Pearson, and an undivided half of which was already subject to a mortgage to Rawson to secure about $55,000.00. It will thus be seen that the mortgage of November 8 covered but a small part, in quantity or value, of the total property of the company.

The circumstances, which led up to the execution of this mortgage, are as follows: As has already been stated, James H. Pearson had contributed $90,000.00 in money to the company; early in the fall of 1883 it appeared that the business had been a losing one, and that more money was necessary; Perry had no property except what was in the company and was unable to raise money, to any amount, on his individual credit; Pearson was a man of means and doing business as a member of the firms of J. H. Pearson & Co. in Chicago and J. H. Pearson & Son in Saginaw; he had facilities for raising money and could do so upon the credit of his own name; arrangements were accordingly made with S. W. Rawson, president of the Union Trust Company in Chicago, to furnish $30,000.00 in September, 1883, and $30,000.00 more thereafter if it should be needed; $30,000.00 was so furnished on September 20, 1883, the company giving its two notes of that date, one for $10,000.00 due in eleven months and one for $20,000.00 due in twelve months, both guaranteed by J. H. Pearson and Perry, and secured by a proportional amount of the stock of each; in the early part of November, 1883, it became apparent that the second sum of $30,000.00 would be needed, and, as it could not be obtained without the guarantee of James H. Pearson, the latter required the mortgage as further security against his personal liability. Accordingly $30,000.00 was thereafter obtained upon three notes of the company, each for $10,000.00, dated December 20, 1883, January 21, 1884, and February 20, 1884, all guaranteed by James H. Pearson and payable in ten months.

Was appellant wronged or injured by the mortgage of November 8, 1883? If any controversy had arisen between the company and its creditors, the latter may have had the right to complain of this mortgage, given to two of the directors while the corporation was so largely in debt, under the principles discussed by this court in *Beach et al.* v. *Miller,* 130 Ill. 162. But no creditor ever complained, and all the creditors were finally paid in full. We fail to discover anything in the evidence tending to show that the mortgage enured in any way to the damage of the appellant. It had nothing to do with the failure of the sale to Rathborne, which fell through for other reasons.

At that time James H. Pearson had invested $90,000.00 in money in the company and was liable as guarantor or endorser on its paper to the amount of $46,000.00, towit: $30,000.00 on the notes of September 20, 1883, and $16,000.00 on notes of the company endorsed by James H. Pearson & Son of Saginaw. He was then asked to guarantee $30,000.00 more of the company's paper, which he did upon receiving the mortgage, making his total liability for the corporate debts $76,-000.00. In addition to this he stood face to face with the fact, that the company had lost $40,000.00 in its business for the year 1883, and with the further fact that appellant, who had the management of the business at the camps, at the mill and in the matter of manufacturing, marketing and selling the lumber, was the owner of $70,000.00 more of the stock of the company than the Pearsons held.

Appellant says that the Pearsons agreed to furnish all the money which the company should thereafter need in consideration of the execution to them of this mortgage. The appellees both deny this, and testify that the agreement they made to furnish additional funds had reference solely to the second sum of $30,000.00 obtained in December, 1883, and January and February, 1884. We are not satisfied, from an examination of the evidence, that the appellees agreed to assume any

greater liability in behalf of the company than that which they did actually incur. In the absence of such agreement it can not be said, that appellees were under any legal obligation to pay out of their individual means the debts of the corporation merely because they were stockholders in it.

Appellant states he applied to the Pearsons in the middle of October, 1884, to release some of the property covered by the mortgage of November 8, 1883, and they refused to do so. That instrument provides that it "should be released in proportion as fast as the endorsements ceased to be outstanding." The proof shows that in October, 1884, the Pearsons were still personally liable upon paper of the corporation to the amount of $46,000,00. It would seem, therefore, that the $30,000.00 falling due in August and September, 1884, had been paid. It may be that the appellees did wrong in refusing to give the release asked for, but the proof does not show that appellant demanded a release of any particular part of the property, or took any pains to ascertain what part should be released. It was necessary to determine in some way what proportion of the mortgaged premises rightfully applied to the endorsed debts which had been paid, and what proportion should remain as security for the endorsed notes still unpaid. The appellant has not shown that he presented his demand for a release in such shape that appellees were bound to comply with it, nor is it made to appear how the company was injured in any way in its efforts to raise money or otherwise by the refusal of such release, nor how the appellant was injured thereby in his efforts to dispose of his stock.

It is claimed that appellees made statements to Perry himself which had the effect of discouraging him and exciting his fears as to the future of the company. It was impossible for them to tell him anything about the company or its affairs or its prospects, which he did not know. The pecuniary liabilities of the company pressed as heavily upon them as upon him. If, when they stated the truth to him, he became de-

pressed thereby, we cannot see that they are to blame. It is urged, however, that by reason of the fact that Perry and the Pearsons were co-stockholders and co-directors in the company, there were confidential relations between them such as exist between a trustee and *cestui que trust*, and that, therefore, appellant, as the *cestui que trust*, has the option to set the sale aside independently of the question whether it was fraudulent in fact or not.

It is true that, in a certain sense, the directors of a corporation occupy the position of trustees towards the stockholders. As the value of the shares of the stockholders and their rights in connection therewith are affected by the conduct of the directors, a trust relation is created between them. The directors owe a fiduciary duty towards the stockholders in dealings which may affect the stock. (3 Pomeroy's Eq. Jur. sec. 1090). It would certainly be most inequitable to permit the directors of a corporation to so manage its business, or to so deal with its property, as to lessen the value of its stock for the purpose of purchasing such stock for themselves at a low figure. But in the present case the appellant was more than an ordinary stockholder; he was not only the owner of a majority of the stock, but was himself a director and the president of the corporation, entrusted with the control and direction of its business. Under his management the company met with large losses in the prosecution of its business and was obliged to borrow large sums of money. Upon a survey of the whole record, we are not prepared to say that, if the conduct of the directors caused a depreciation in the value of the stock, such depreciation may not have been due as much to the unfortunate management of the appellant as to anything done by the appellees.

If, however, it be admitted that there were confidential relations between the parties, we see nothing in the evidence to convince us that there was an abuse of such relations. Moreover, the testimony of the complainant himself shows that he

had lost confidence in the appellees and had begun to suspect them of trying to injure him long before he sold his stock to them. He dealt with them under the belief that they were trying to get his stock away from him, and was therefore on his guard against them. Confidence cannot be abused where confidence has ceased to exist.   o

It is also charged that the appellees spoke disparagingly of the company to others, and thereby created an unfavorable impression as to the value of the stock. We cannot notice all the evidence upon this subject, but will refer to three circumstances.· *First,* it is stated that in the fall of 1884, James H. Pearson spoke to several of his friends of his willingness to give up his stock if he could be released from liability for the debts of the company. It is not shown, however, that these remarks produced any action or prevented any action, which resulted in injury to the interests of the appellant. They seem to have been born of the irritation produced by the losses of the company, by the pressure of its debts and by dissatisfaction with Perry's conduct of the business. At this time considerable friction had arisen between the parties, the Pearsons attributing the misfortunes of the company to what they called Perry's mismanagement, and Perry attributing such misfortunes to the refusal of the Pearsons to advance more money and to their efforts to force him to surrender his stock. We cannot say that remarks to outside parties made by the appellees caused any more damage than remarks made by the appellant. The following is an extract from appellant's testimony: "For two or three months before I sold out to Mr. Pearson I had, here and in Michigan, called the Pearsons robbers and thieves, had talked around among my acquaintances and among the lumbermen against the Pearsons, calling them robbers." *Second,* it is said that E. H. Pearson spoke of the stumpage on the Rust lands as being less than it was estimated to be upon the organization of the company. This remark was made in the early part of September, 1884, at

a private meeting of the directors, at which the book-keeper and a party, to whom appellant had transferred some of his stock, were present. It was a part of the discussion as to the plans of the coming year. It was true that a report had come as to shortage in the stumpage from a party examining the timber with a view to buying some of it, but it was not spoken of for the purpose of depressing appellant's stock and was immediately followed by the passage of a resolution as to the mode of conducting the business during the coming winter. The adoption of the resolution showed that appellant was expected to continue with the company. *Third,* Pearson admitted to one Watkins that certain lumber sold to him by the company was worth less than the figure at which it had been sold. Perry had sold the lumber to Watkins at $27.00 per thousand feet and had shipped it from Michigan to Chicago to be delivered. Watkins took Pearson to see it, complaining that it was not worth $27.00. Pearson, upon examining it, agreed with Watkins upon the subject. Afterwards Perry settled the matter by reducing the price to $24.00. We cannot see that the standing of the company, or the value of its stock, was seriously affected by this incident. If the lumber was not really worth $27.00, Pearson's admission of its inferiority was no more calculated to damage the company than Perry's overvaluation of it.

In addition to what has already been said, the conduct of Perry after he sold his stock in November, 1884, was such as to estop him from insisting upon a cancellation of the sale. As early as March, 1885, he was considering the subject of setting aside the sale; on March 15, 1885, he demanded redress of J. H. Pearson; in April, 1885, he consulted three lawyers and resolved to take steps to recover back his stock. This appears from his own testimony. Having come to such a determination he should have begun proceedings at once. Instead of doing so, he did not tender to Pearson a deed of the property received from him until April 17, 1886, nor file

the present bill until April 22, 1886. In the mean time he permitted his vendee to carry out the provisions of the sale, and himself reaped the advantage of this course. The notes for $40,000.00. which he had executed to Longley fell due in the summer and fall of 1885. Pearson had given bond with good security for the payment of these notes by the company upon their maturity. Appellant not only waited until these notes were paid in the summer and fall of 1885, but he went to Pearson and inquired whether they had been paid, and even asked that they should be shown to him. With the resolution already formed to set the sale aside, he permitted $40,000.00 and interest to be paid out in fulfillment of the terms of the sale.

Again, when J. H. Pearson conveyed his homestead lot in Chicago to the appellant, he was living on it. Appellant permitted him to remain there upon payment of rent until May 1, 1885. At the latter date he re-rented the house to Pearson for another year and collected the rent of him each month. This conduct can hardly be reconciled with a resolution then formed to repudiate the transfer of the stock and restore the house to Pearson.

Again, Campbell, the broker employed by the North Shore Lumber Company to sell the property in the summer and fall of 1885, kept appellant informed of what he was doing. Appellant knew all about the negotiations for the sale to Hall & Buell in December, 1885, and January, 1886, and was at once informed of its consummation on January 4, 1886. He waited for more than three months before filing his bill, and until all the debts of the old company, amounting to more than $210,-000.00, had been paid off.

Where a party desires to rescind upon the ground of fraud, he must not remain silent and continue to treat the property as his own or to receive the benefits of the trade he has made; if he does so, he will be held to have waived his objections, and will be bound by the contract as if the fraud had not occurred.

"He is not permitted to play fast and loose." (*Grymes* v. *Saunders*, 3 Otto, 62).

It is to be noted, also, that when the sale of November 24, 1884, was consummated, Perry was not alone. There were present with him his attorney, and one A. T. Merriman, to whom he had sold $6000.00 of his stock. This stock he had re-purchased from Merriman and it was included in the sale to J. H. Pearson. It cannot be said, therefore, that, in doing what he did, he was without the counsel of competent advisers.

We see no reason for disturbing the judgment of the Appellate Court. It is accordingly affirmed.

*Judgment affirmed.*