VON AU v. MAGENHEIMER et al.

(Supreme Court, Appellate Division, Second Department.  May 1, 1908.)

1. CONSPIRACY—CIVIL LIABILITY—GIST OF ACTION—DAMAGE.

In a civil action for conspiracy, the gist of the action is the damage, not the conspiracy, and the averment and proof of conspiracy is only important to join all the defendants, and hold them responsible for the acts and declarations of each.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 5.]

2. SAME—ACTIONABLE DAMAGES.

In a civil action for conspiracy, the damage sustained must be legal damage directly resulting from the wrong, not damages which are uncertain, contingent, and remote, and, where damage results from an act which if done by one alone would not afford ground of action, the act will not be rendered actionable because done by several in pursuance of a conspiracy.

3. FRAUD—GROUNDS OF ACTION.

The principles which govern an action for fraud and deceit by means of false pretenses are the same, whether the fraud is alleged to have originated in a conspiracy, or to have been solely committed by a defendant without aid or co-operation.

4. CORPORATIONS—SALE OF CORPORATE STOCK—FRAUD—REMEDY OF SELLER.

If directors in bad faith refuse to make proper distribution of earnings or commit waste, or so manage the company's affairs as to lessen the value of its stock for the purpose of buying it for themselves at a low cost, the injury is primarily to the stockholders collectively, and must be redressed through the corporation, and if the wrongdoers are in control, or the corporation refuses to sue, the remedy is by an action by a stockholder in behalf of the corporation, but, if a stockholder has been induced by such wrongful acts to part with his stock, he is not thereby rendered remediless; and hence, where the managing directors misrepresented to a stockholder that the company, which in fact was in a prosperous condition, was suffering reverses, and that only a very small dividend could be expected, and at the same time greatly increased the officers' salaries temporarily so as to strengthen the impression that a higher dividend was unlikely, for the purpose of obtaining the stockholder's holdings at a price less than their value, which they accomplished, their acts, though not technically constituting deceit, were in effect a fraud on the stockholder, who could recover the damages sustained as a result thereof after having sold the stock and severed his relations with the company.

5. WORDS AND PHRASES—"FREEZE OUT."

To "freeze out" a stockholder in a corporation, within the meaning of the colloquial phrase, consists of conduct of those in control of the corporation, in manipulating and misrepresenting its affairs, so as to induce the stockholder to part with his holdings under the impression that they are less valuable than they really are.

6. FRAUD—ACTIONS—RELIEF.

A party defrauded in contracting may rescind or recover his damages.

7. CORPORATIONS—WRONGFUL ACTS OF DIRECTORS—REMEDIES.

Where wrongful acts of directors of a corporation result in a direct injury personal to an individual stockholder and indirectly injure the corporation, both the corporation and the stockholder may sue to recover the damage respectively suffered.

8. APPEAL—REVIEW—HARMLESS ERROR—RULINGS TECHNICALLY.

Courts will not be astute to discover technical errors for the purpose of setting aside a verdict, where it is apparent that no different result could well be reached.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 4034.]

9. GOOD WILL—DETERMINATION OF VALUE—QUESTION OF FACT.
    The number of years' purchase of the annual profits of a business that
    should be taken in determining the value of its good will is a question of
    fact for the jury, dependent on the surrounding circumstances.

10. SAME—EVIDENCE—SUBSEQUENT HISTORY OF BUSINESS.
    In determining the value of the good will of a business at the time of
    the sale of stock, evidence of the subsequent business of the company, in-
    cluding balance sheets of subsequent years, was competent as a basis for
    comparisons and conclusions as to its condition at the time of the sale.
        Gaynor, J., dissenting.

Appeal from Trial Term.

Action by Tillie Von Au, executor of Otto E. Von Au, against Louis
Magenheimer and another, impleaded with John Noval. From a
judgment for plaintiff and an order denying a motion for a new trial,
defendant Magenheimer and another appeal. Affirmed.

See 100 N. Y. Supp. 659, 115 App. Div. 84.

Argued before WOODWARD, HOOKER, GAYNOR, RICH, and
MILLER, JJ.

Charles F. Brown (George E. Mott and Samuel S. Whitehouse, on
the brief), for appellants.

Thomas F. Magner, for respondent.

MILLER, J. The plaintiff as committee of the testator, her hus-
band, who was insane, held 483 of the 1,500 shares of the capital stock
of the Mason, Au & Magenheimer Confectionery Manufacturing Com-
pany. The defendants Magenheimer and Haug each owned 483 shares,
were respectively president and treasurer of the company, and had the
sole control and management of its affairs. The complaint avers that
the defendants conspired to obtain the stock owned by said testator
for less than it was worth; and that to depress the value of the stock,
to cause the plaintiff to believe that it was worth less than it was, and
to induce her to sell for an inadequate consideration, they fraudulently
did three things, viz.: (a) Refrained from declaring a fair dividend
and declared one of only 3 per cent.; (b) increased the salaries of the
defendants Magenheimer and Haug from $2,500 to $7,500 each, and of
the defendant Noval from $2,000 to $3,000; and (c) represented that
the company had suffered reverses to such an extent that it could not
pay a larger dividend than 3 per cent., and that it was doubtful whether
it could ever be able to pay more. The company was organized in
1890. It had paid dividends as follows: 1890, 9 per cent.; 1891, 14
per cent.; 1892, 15 per cent.; 1893, 11 per cent.; 1894, 9 per cent.;
1895, 13 per cent.; 1896, 12 per cent.; 1897, 14 per cent.; 1898, 13
per cent. During that period it had charged off for depreciation $40,-
360.29, and accumulated a surplus of $21,700.16. The evidence tend-
ing to prove that the defendants conspired to obtain said stock for less
than it was worth, and to accomplish their design made the representa-
tions and did the specific things charged, is neither denied nor ex-
plained, as they refrained from testifying. Nor is there any doubt
that the plaintiff did not wish to sell said stock, but was induced to do
so by the acts aforesaid. The alleged wrongful acts occurred at a
meeting of directors held July 20, 1899, which the plaintiff was in-

vited to attend after she had declined to sell her stock. Said representations were made in response to a statement on behalf of the plaintiff that a 3 per cent. dividend on her stock would not enable her to provide for her children and care for her insane husband; and forthwith the defendants voted an increase of salaries amounting to $7^3/_{10}$ per cent. on the capital of the company. It is said that the defendants were not guilty of deceit in representing that the company could not pay a larger dividend, because of heavy losses, for the reason that there had been heavy losses. It did appear that there had been the usual loss on customers' accounts; that a suit was pending involving a contingent liability on a paper box contract which was settled a year afterwards by the payment of $1,820 in settlement and for expenses; and that an investment of $18,000 in some Lloyds insurance companies which had been lost at different times prior to the last preceding semiannual statement and declaration of dividends was charged to profit and loss during the half year in question. The corporation was a family affair, and presumably there was no market for its stock outside of its members. The plan succeeded. On the 16th of August the plaintiff agreed to sell the defendants Magenheimer and Haug her stock for $50,000. On the 17th of August, less than a month after they had declared that the condition of the company did not permit a larger dividend than 3 per cent., a special dividend of 10 per cent. was declared, and the proceeds were used to meet the checks given in payment of said stock, and at the following regular meeting the salaries of the officers were reduced to $4,000 each.

I think a case of fraud and deceit was established. The defendants undertook to create the impression that the business of the company was not as profitable as it had been, and that unusual losses had been sustained since the last semiannual dividend had been declared; but the record shows that the company had never been more prosperous, and that any unusual loss was a matter of bookkeeping. It will not do to say that the statement that there had been heavy losses was literally true. The law does not suffer deceit to be practiced by any trick or device. The defendants at least owed the plaintiff the duty to speak the whole truth, if they spoke at all, not literally in words, but truthfully in substance. When they undertook to explain the condition of the company, they were bound not to deceive her either by the suppression of the truth, or by making statements which, though literally true, were calculated to deceive. They are to be judged by what they intentionally induced her to think, not by what they literally said. The plaintiff frankly said that she was induced to sell her stock because she could not live on dividends of 3 per cent., and the appellants argue that the resolutions of the directors declaring dividends and increasing salaries, not the alleged misrepresentations, induced the sale. But her father, who represented her and upon whom she relied, testified that said representations, among other things, induced him to advise the sale. The defendants' position is not improved by the fact that they added oppression to fraud and deceit. I have discussed the case thus far solely from the standpoint of deceit. It may be admitted that the jury were not bound to draw the inferences which I have, al-

though it may be difficult to perceive how they could have done otherwise.

The following requests to charge were separately made by the defendants and refused by the court, viz.:

"That no fact with reference to the business of the Mason, Au & Magenheimer Company, or as to the value of this stock, or the condition of the business of which the plaintiff or her father had knowledge before the sale of the plaintiff's stock can be treated by the jury as fraudulent, and can be made the basis of a verdict by them for the plaintiff."

"That the increase of said salaries at said meeting on July 20, 1899, was not fraudulent, and did not create any cause of action in favor of the plaintiff against the defendants for fraud."

"That the plaintiff having sold her stock with knowledge of the increase of said salaries had, after the sale of her stock, no cause of action therefor against the defendants for fraud, and she cannot recover any damages arising out of such increase of salaries in this action."

"That no recovery can be had in this action for damages on the ground that the defendants refrained from declaring a dividend of more than 3 per cent. on the stock of the company at the meeting of July 20, 1899."

"That the plaintiff having sold her stock with knowledge of the declaration of said dividend of 3 per cent. had thereafter no cause of action thereon for fraud against the defendants for damages arising out of said sale."

"That no recovery can be had in this action on the ground that on August 14, 1899, the officers of the company declared a dividend of 10 per cent. on the capital stock of the company."

"That the fact that neither the plaintiff nor her father had any knowledge of the declaration and payment of said dividend until September, 1904, precludes the jury from giving to it any consideration as a fraudulent act against the plaintiff or as an enticement for the sale of the stock."

The appellants contend that the declaration of the dividend and the voting of increased salaries cannot be the basis of an action for fraud; that, while that may have induced the plaintiff to sell, she was not thereby deceived; that her remedy for such misconduct, if it were misconduct, was within the corporation and by a representative action to restrain or redress the wrong; and that the refusal to charge as requested presents reversible error, for the reason that we cannot know upon what theory the jury found a verdict. The respondent contends that the unlawful intent is the essential element of conspiracy, and that, such intent being shown, it characterizes the acts as fraudulent, even though an action strictly for fraud and deceit could not be maintained. In a civil action for conspiracy the gist of the action is the damage, not the conspiracy; and the averment and proof of conspiracy is only important to join all the defendants and hold them responsible for the acts and declarations of each. Tappan v. Powers, 2 Hall, 301; Jones v. Baker, 7 Cow. 445; Moore v. Tracy, 7 Wend. 229; Hutchins v. Hutchins, 7 Hill, 104; Buffalo Lubricating Oil Co. v. Everest, 30 Hun, 588; Lee v. Kendall, 56 Hun, 610, 11 N. Y. Supp. 131. The damage sustained must be legal damage directly resulting from the wrong, not damages which are uncertain, contingent, and remote. Bradley v. Fuller, 118 Mass. 239. "Where damage results from an act which if done by one alone would not afford ground of action, the like act would not be rendered actionable because done by several in pursuance of a conspiracy." Boston v. Simmons, 150 Mass. 461, 23 N. E. 210, 6 L. R. A. 629, 15 Am. St. Rep. 230. "The principles which govern an action for fraud and deceit by means of false pretenses are

the same, whether the fraud is alleged to have originated in a conspiracy, or to have been solely committed by a defendant without aid or co-operation." Brackett v. Griswold, 112 N. Y. 454, 20 N. E. 376. We may assume that the jury found—they could not well avoid finding—that the acts of the defendants in declaring a dividend of only 3 per cent. and increasing their salaries were wrongful and done for the purpose of inducing the plaintiff to sell them her stock for less than it was worth. Thus the question comes to this: When such a conspiracy is successful, is the injured party without remedy for the wrong? I think a wrong in law and in good morals was done the plaintiff, and the maxim, "Ubi jus ibi remedium," leads me to look for the remedy.

It must be granted at the outset that, where directors in bad faith and for purposes of their own refuse to make proper distribution of earnings, the injury is primarily to the stockholders collectively, and must be redressed through the corporation by a suit in equity to compel proper action, and that, where waste is committed, the direct injury is to the corporation, and, if the wrongdoers are in control or the corporation refuses to sue, the remedy is by a representative action on behalf of the corporation. Morawetz on Private Corporations (2d Ed.) §§ 276, 277; Gamble v. Q. C. W. Co., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527; Sage v. Culver, 147 N. Y. 241, 41 N. E. 513; Flynn v. Brooklyn City R. R. Co., 158 N. Y. 493, 53 N. E. 520; Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827. In such action an averment of reduction in the value of the stock is irrelevant. Kavanaugh v. Commonwealth Trust Co., 181 N. Y. 121, 73 N. E. 562. A stockholder cannot maintain a personal action for a wrong to the corporation merely because the indirect result is a diminution in the value of his shares. Niles v. N. Y. C. & H. R. R. R. Co., 176 N. Y. 119, 68 N. E. 142. Had the conspiracy in this case been unsuccessful, there would have been no direct injury personal to the plaintiff, and she might have succeeded by appropriate action in restraining the payment of the increased salaries and in compelling a proper distribution of earnings; but she did not learn of the resolutions of August 17th and of the following January, which stamped those of July 20th as wrongful beyond peradventure, until long after she had sold her stock; in fact, they were not adopted until those of July 20th had served their purpose. Moreover, it must be confessed that the courts cannot completely protect minority stockholders from the oppressive acts of those in control. So that the wrong is proved, the remedy is adequate, but the difficulty lies in the proof. It might have been difficult for the plaintiff to prove with the facts at her command prior to the sale that the directors acted in bad faith in declaring a dividend of only 3 per cent., and she may not have succeeded in restraining the payment of the increased salaries, unless the resolution was adopted by each one voting to increase his own, which does not appear. If the directors act in good faith, the courts cannot interfere with their discretion respecting the management of the internal affairs of the corporation. Gamble v. Q. C. W. Co., supra; Burden v. Burden, 159 N. Y. 287, 54 N. E. 17; Greeff v. Equitable Life Assur. Society, 160 N. Y. 19, 54 N. E. 712,

715, 46 L. R. A. 288, 73 Am. St. Rep. 659. And see cases cited on page 32 of 160 N. Y. and page 715 of 54 N. E.

I have referred supra to cases dealing with the remedies for injuries to the corporation or the stockholders collectively, and will briefly notice those disclosed by my research, involving sales of shares to managing directors, which may be thought somewhat analogous. In Carpenter v. Danforth, 52 Barb. 581, and Board of Commissioners, etc., v. Reynolds, 44 Ind. 509, 15 Am. Rep. 245, it was held that sales by a stockholder to a director could not be set aside on the ground that the parties occupied the strict relation of trustee and cestui que trust, but no oppressive or fraudulent acts were shown. In Perry v. Pearson, 135 Ill. 218, 25 N. E. 636, one director sought to set aside a sale to a co-director, and the court refused relief, for the reason, among others, that the situation of the parties was equal; but the court said:

"It would certainly be most inequitable to permit the directors of a corporation to so manage its business, or to so deal with its property, as to lessen the value of its stock for the purpose of purchasing such stock for themselves at a low figure."

In Niles v. N. Y. C. & H. R. R. R. Co., supra, the court, per Haight, J., say:

"There are wrongs which if committed against a stockholder entitle him to a right of action against the person committing the wrong for the damages sustained, as, for instance, where a person had been induced to purchase stock in a corporation and pay a higher price than the stock was fairly and reasonably worth, or where the owner of stock had been induced to part with it for a less sum than its true value by reason of false and fraudulent representations of others with reference to its value. Rothmiller v. Stein, 143 N. Y. 581, 38 N. E. 718, 26 L. R. A. 148; Ritchie v. McMullen, 79 Fed. 522, 25 C. C. A. 50."

In the Rothmiller Case cited the plaintiff was induced, by fraudulent representations as to the condition of the company, to sell his stock to a third party on a different basis than he otherwise would. The representations were not made to induce the sale, and the defendants did not profit by it, but the court held that the wrong and resulting injury were undoubted. The Ritchie Case cited differs from this only in that the directors, charged with the conspiracy to so manage the affairs of the company as to force the plaintiff to sell, were pledgees of his stock, and that the purpose of the conspiracy had not been accomplished further than to diminish its value, but, although the sale had not occurred, the wrongdoers were held liable to respond in damages for the diminution in the value of the stock, on the ground of a violation of duty as pledgees. All the wrongs charged were wrongs to the corporation, for which the corporation, or a stockholder in its behalf, could have sued, but the Circuit Court of Appeals held that that did not prevent the acts being wrongful to the particular stockholder, and in that connection said, per Taft, Circuit Judge:

"As the very object of the conspiracy and wrongs done was to cause Ritchie to cease to be a stockholder, it might be difficult to point out how such an indirect remedy could benefit him after the wrong had been completed and he had parted with his ownership of the stock."

In that case the stockholder suffered damage in the diminution of the value of his stock. In this case damage resulted from the sale be-

low the value of the stock. In Walsham v. Stainton, 1 De G. J. & S. 678, the leading English case most nearly analogous, directors conspired to depress the value of the shares so as to purchase them for less than their value. The scheme resorted to was the withholding of funds belonging to the corporation so as to reduce the apparent earnings and the preparation of fictitious balance sheets. The action was in equity to set aside the sale and to compel the wrongdoers to account for all dividends and bonuses paid in respect of the shares sold. The Lord Justices on appeal reversed the ruling of the vice chancellor sustaining the demurrer to the bill, and held that the action was maintainable. In pronouncing judgment Lord Justice Turner said:

"It is not denied (at least the vice chancellor has not denied) that there would be a remedy at law against Joseph Stainton and his estate in respect of his breach of duty."

In that case, as in this, fraudulent acts were charged, but the withholding of funds like the wrongful increase of salaries was a wrong to the corporation, and I fail to perceive why a remedy should be given for one wrong and denied for another, when both are intended to and actually do accomplish the same purpose. Coercion is as effective as deceit. The party deceived acts upon a misunderstanding. The party coerced acts because he has no choice. It is no answer to say that the wrong, if any, was to the corporation, and that the plaintiff voluntarily abandoned her remedy within the corporation. The wrong was aimed at and injured the plaintiff, not the corporation, and within the corporation she was practically at the mercy of the conspirators. Though she might have restrained the payment of the increased salaries, the defendants had only to tax their ingenuity to devise other means to avoid distributing earnings. The discretion of directors in that respect is so unlimited that a successful suit to compel the distribution of earnings is almost unknown. That wide discretion affords many opportunities for oppression of minority by majority stockholders which cannot successfully be met within the corporation. The injured stockholder, as in this case, may not get clear proof of the bad faith of the directors until after he is forced out. The process applied to the plaintiff in this case has become so common with the growth of corporations that a colloquial phrase to express it has become current. See Century Dictionary, "to freeze out." The plaintiff's withdrawal was not voluntary. She was constrained, as most of us would be, to take the best terms offered. The defendants profited, and she was injured by exactly the difference between the value of the stock and what they paid her; and, having accomplished their purpose, they should not now be heard to say that that was the indirect result of their wrong, that their victim should have kept her stock and sought redress through the corporation, which they did not intend to, and in fact did not harm. It may be that the particular wrong was like unto duress. So far as I can discover, that has only been held available as a defense or as a ground of rescinding contracts or of recovering money paid, ordinarily an adequate remedy, for it restores the party injured to his original position. I have no doubt that a court of equity would have little difficulty in setting aside this sale and in compelling the defendants to account for all profits received, but that remedy would

not be adequate, for it would only put the plaintiff back in the hands of the wrongdoers. A party defrauded may rescind or recover his damage. While the wrong now being considered was not technically a deceit, its effect was to defraud the plaintiff, and, in respect of the remedy at least, should be treated as a fraud. It was a species of fraud. By the wrongful acts of the defendants, the plaintiff was led to think that her stock was worth less than in fact it was, and we should not indulge in hair-splitting discriminations between that kind of deceit and a fraudulent misrepresentation or concealment respecting an existing fact, in view of the relations of the parties. If their relation was not strictly of the fiduciary character of trustee and cestui que trust, it was in a sense fiduciary; at least, the parties did not deal on equal terms. Indirectly, if not actually, the defendants were the agents or trustees of the plaintiff, for in truth the entity called the corporation but represents the stockholders. In law the two are distinct, as the stockholders own merely their shares, not the property of the corporation; but, in fact, each share represents a given interest in the property of the corporation. While the defendants did not have control of the plaintiff's shares, they had control of the property represented by said shares, and their management of that property affected the value of the shares precisely as though the corporate property and the shares were one and the same. The defendants were not under the disabilities of trustees in respect of dealings with a cestui que trust, but their superior position imposed upon them some duty to the plaintiff as well as to the corporation, at least the duty not to take advantage of the opportunity afforded by their position to wrong her by any affirmative act designed to injure. Having the power to so manage the affairs of the corporation as to affect the value of her shares, they owed her the duty to refrain from intentionally abusing that power actually or apparently to depress the value of those shares for the purpose of acquiring them at an undervaluation. When they succeeded in securing her stock by that misuse of power, they committed a breach of duty to her resulting in injury, and it is immaterial that their act may also have wronged the corporation. In view of the conditions under which business is now conducted, it will be very unfortunate if it shall be held that the duty of corporate managers in respect of their conduct of the corporate affairs is solely to the corporate entity, and that; however great a designed injury to an individual stockholder may be, he can only get redress through the corporation. The purpose of the wrong being to injure the plaintiff, that should be held to have been its effect. It surely cannot be the law that a conspiracy to injure by acts in themselves wrongful affords no remedy, unless it fail. In the Niles Case cited, supra, the stockholders collectively were indirectly injured precisely to the extent that the corporate assets were wasted; and a representative action on behalf of the corporation to compel the wrongdoers to make good the loss was adequate to protect both the corporation and the stockholders, because restoration of the corporate assets restored the value of the shares. And therein lies the distinction between an indirect injury to all stockholders resulting from a direct injury to the corporation, which represents them collectively, and a direct injury personal to an individual

stockholder, resulting from a wrong which may also injure the corporation but in a different way. In the latter case it would seem to be clear on principle that both could have an action for the wrong, the corporation to recover the damage suffered by it and indirectly by the stockholders collectively, and the stockholder to recover the damage peculiar to himself individually. Take the case of a corporation whose shares are actively dealt in. Suppose the directors circulate false reports to depress the market value of the stock for the purpose of buying it in; the stockholder would be injured in the lessened market value of his shares, the corporation would probably be injured in its credit. Both could have their action, and the stockholder could sue without parting with his stock. It seems to me the case is no different if the same thing is accomplished by a different wrong, as, for instance, the misuse of power to prevent the distribution of earnings. I am speaking now of market as distinguished from intrinsic value of the shares. Nor again does the case seem to me to be different, if, where the stock has no market value, the directors abuse their wide discretionary powers for the purpose of leading an individual stockholder to think that earnings will be consumed in other ways than the payment of dividends, thereby inducing him to sell at a low price. In the case at bar, the stock had no market value, and the direct injury to the plaintiff resulted from the sale induced by the defendants' wrongs.

It is quite immaterial that the wrong was denominated a fraud. The facts were alleged and proved, and they permitted but one result. We are not embarrassed by precedent, and, applying legal maxims to the facts before us, have no hesitation in holding that the wrongful acts of the defendants resulted in direct injury to the plaintiff, for which the law affords her a remedy by an action on the case to recover her damage. These conclusions render it unnecessary to consider further the requests to charge or the rulings on evidence. It is true that the jury could only consider the subsequent acts of the defendants as shedding light upon the purpose and motive of their acts prior to the sale; and some of the rulings may have been technically wrong, but courts will not be astute to discover technical errors to set aside verdicts, when it is apparent that no different result could well be reached.

The jury rendered a verdict of $33,000. It is urged that this is excessive, and that errors were committed by the court in refusals to charge and in rulings on evidence bearing upon the question. The jury found that the stock was worth 171. Its book value as shown by the balance sheet of July 1, 1899, was 109. The jury may have found by comparing similar items in that balance sheet and those of the years immediately preceding and succeeding, and from other evidence in the case, that all the assets were not appraised at their full value. There is testimony that the real estate was carried on the books at more than it was worth. I think, considering all of the evidence, the jury was warranted in finding that the tangible assets were worth at least the par value of the stock. The important question, then, for the jury to determine was the value of the good will. This court on the

former appeal (115 App. Div. 87, 100 N. Y. Supp. 659) stated the rule for determining that, and the trial court read to the jury the opinion of this court on the subject. The court charged at the request of the defendants that in determining the net profits the jury must deduct interest on the capital and surplus employed in the business. No request for any more specific instruction than that given was made, except the court was requested to charge:

"That the number of years which the average annual net profits are to be multiplied by cannot in the present case exceed five."

In view of the request which the court had already charged, and of what was said by this court on the former appeal, it cannot be said that it was error for the court to refuse the charge requested. It was a question of fact, in view of the surrounding circumstances, how many years' purchase of the average annual profits should be taken as the value of the good will. In the Matter of Silkman, 121 App. Div. 202, 105 N. Y. Supp. 872, it was held that two years' purchase of the average annual profits for the three preceding years was a proper rule in that case; but what was said by Mr. Justice Rich, speaking for a majority of this court on the former appeal in this case, was quoted with approval. The court was requested to charge the jury:

"That no fact in reference to the business of this company subsequent to January 1, 1900, can be considered by them in determining the value of the good will of the company or the value of the plaintiff's stock."

I think the request was properly refused, for the jury were entitled to consider pertinent facts in the subsequent history of the company for the purpose of making comparisons and drawing conclusions as to its condition at the time of the sale. The court did not charge that the good will could be computed on the profits of the business succeeding the sale, and no request calling for specific instruction on that point was made. It is alleged that error was committed in admitting the balance sheets of subsequent years, but, as already shown, they were admissible for the purpose of comparison; and, while they show that the company continued to be prosperous, it is not perceived how the defendants were thereby harmed. The semiannual statements show that the average annual net profits for the three preceding years, after charging off losses and allowances for depreciation, were $27,-181.97. I think the jury were at liberty to find that the actual net earnings in the business, eliminating losses outside of the business, were more than that; but at that figure the company earned net above losses and depreciation of plant more than 18 per cent. on its capital. If from that sum 6 per cent. on the capital and surplus be deducted, as the court charged the jury should be done in determining the net profits, it will appear that the jury found that the good will was worth approximately six times the average net earnings so computed.

But, in view of all the surrounding circumstances, I do not think the verdict was excessive, and am of the opinion that the defend-

ants will have made a good bargain after paying this judgment, and I advise that it be affirmed.

Judgment and order affirmed, with costs. All concur, except GAYNOR, J., who reads for reversal.

GAYNOR, J. (dissenting). I am still of the opinion expressed in my opinion when the case was here before that no cause of action was made out—if one be alleged (115 App. Div. 84, 87, 100 N. Y. Supp. 659); and in addition it seems to me that substantial error was committed in the refusal of requests to charge. If the plaintiff is to be allowed to recover it must be on the cause alleged in the complaint. The prevailing opinion seems to hesitate on whether the case is to be considered as one of fraud or of duress in order to sustain the judgment. If the latter, what the law suffers to constitute duress is a very different question to what constitutes fraud. The 3 per cent. dividend declared was a semi-annual dividend and not an annual one, as the prevailing opinion seems to state, and it seems to me that the facts are not fully stated. There was no concealment or mis-statement of any fact. Expressions of opinion by the defendants must not pass for fraudulent statements.

That the defendants were selfish is no reason for deciding against them. Political economy from Adam Smith down, and before him, is founded on selfishness, and not on generosity, or Christian charity. The case is a familiar one in the courts. A man who with a few others builds up a business by all of them working hard together dies, or becomes permanently incapacitated, and his widow or wife cannot understand why things should not go on the same and the fruits of effort be divided as theretofore, notwithstanding the loss of the efforts of her husband to the business.

The plaintiff got more than par for her stock. We all know of much better stocks which cannot be sold for anything near par to-day. She acted under the very best of advice, viz., that of her father, Judge Naehr, in dealing with the defendants, and he was in no way deceived. He knew that the discontent of the defendants over their getting no more out of the earnings than a share pro rata to their shares of stock, although they were now doing all the work, would, in the nature of things, never subside, but would continue and be a factor in the division of the profits.