SCHAFUSS v. BETTS et al.

(Supreme Court, Special Term, New York County. March 6, 1916.)

1. PRINCIPAL AND AGENT ⊛⟶156—REPRESENTATIONS—KNOWLEDGE OF FALSITY.
   Where defendant's agent made false representations to plaintiff, whereby she was induced to sell corporate stock to the agent for defendant, and before the purchase was consummated the agent repeated his conversations fully to defendant, and defendant knew of the falsity of the representations, it was immaterial whether the agent knew that the representations were false.
   [Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 583-587; Dec. Dig. ⊛⟶156.]

2. CORPORATIONS ⊛⟶117—RESCISSION FOR FRAUD—DEFENSES—INEQUITABLE CONDUCT BY PLAINTIFF.
   A rescission of a sale of corporate stock induced by fraud would not be denied, on the ground that plaintiff prior to the sale was attempting to purchase a judgment against defendant, intending after receiving the purchase price to regain the stock under such judgment, where, before she consummated the sale, she learned that she could not acquire the judgment, but nevertheless proceeded to complete the transaction.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 506; Dec. Dig. ⊛⟶117.]

3. CORPORATIONS ⊛⟶117—RESCISSION FOR FRAUD—SCOPE AND EXTENT OF RELIEF.
   Where, after plaintiff was induced to sell corporate stock to defendant by fraudulent representations, the corporation was dissolved, she was entitled to have the contract rescinded and to have the purchaser charged as a trustee ex maleficio, and required to account for the proceeds of the stock thus acquired and all profits derived therefrom.
   [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 506; Dec. Dig. ⊛⟶117.]

Action by Norma F. Schafuss against Farron S. Betts and another to rescind a contract on the ground of fraud. Judgment for plaintiff.

Jerome, Rand & Kresel, of New York City (Isidor J. Kresel and Harland B. Tibbetts, both of New York City, of counsel), for plaintiff.

Armstrong & Keith, of New York City, for defendants Betts and Wilcox.

GIEGERICH, J. The action is to rescind a contract on the ground of fraud. On June 6, 1912, the plaintiff sold to the defendant Wilcox 371 shares of the F. L. Schafuss Company (out of a total of 750 shares issued) for the sum of $6,500. The defendant Betts furnished the money and admits that he was in fact the purchaser, although the negotiations with the plaintiff were carried on by Wilcox, and the plaintiff received the consideration from Wilcox, and delivered the stock

to him, and believed she was making the sale to him. About a year after the sale, and before the action was begun, the corporation was dissolved, and, as there is no longer any stock in existence to be recovered, the plaintiff seeks by this action to impress a trust upon the proceeds of the stock received by the defendant Betts upon the dissolution of the company, including the profits realized by him on such proceeds.

The plaintiff's husband, Theodore C. Schafuss, had formerly been connected with the company, but had severed his connection with it, and its control had passed into the hands of the defendant Betts, who was a large stockholder of the company and had been active in its management before Schafuss withdrew. The 371 shares of stock in question had belonged to Schafuss and had been transferred by him, some time after his leaving the company, to his wife, the plaintiff. After the plaintiff became a stockholder in March, 1911, she sought to obtain detailed information concerning the affairs and business of the company, but difficulties were thrown in her way, and, although a balance sheet statement of its condition was finally sent to her, some of her specific inquiries were refused, and some were answered contrary to the fact. For example, in August, 1911, the plaintiff, though her attorney, sought, among other things, to find out how much business had been done during the past year, but no information was given her on this point. She also sought to find out whether the company held the notes of any of its directors, or whether any loans had been made by the company to any of its directors. On this point she was told that, while she was not entitled to the information, the fact was that no loans had been made to any of its directors or officers, and that the statement of the accounts and bills receivable, set forth in the general statement of the assets and liabilities of the company sent to her, represented the ordinary business debts of a normal going concern. The truth was, however, that at that time the defendant Betts owed the company $4,800, but such indebtedness did not appear in the statement sent to the plaintiff, unless in the accounts and bills receivable, which, as just stated, were represented to her as made up of only the ordinary business debts of a normal going concern. Certainly, the debt of an officer to his company does not come within such a description. The following month Betts charged this debt off to surplus account, so that to one examining the books it would not appear that he owed this amount on stock account, and would appear that the company had lost that amount.

In the latter part of May, 1912, the plaintiff began negotiations with the defendant Wilcox to sell her stock to him. They had conversations by telephone and personally. It was in these conversations that the false representations complained of were made. Among other things, Wilcox told her that the company was "just running along"; that it had never been able to pay dividends, and was in no position to pay dividends, as it was using its surplus to pay up back debts; that its gross profits were used up in conducting its office and factory and the payment of officers' salaries, leaving no surplus for distribution among stockholders; that her proposed price of $20,000 was a

157 N.Y.S.—39

fictitious valuation, and that it was ridiculous to ask such an amount; that the sales to the Victor Talking Machine Company, while large in amount, produced very little net profit, and that the album business, outside the Victor orders, had practically dwindled to nothing. The facts were that the company had never made such large profits as during the fiscal year ending with June, 1912, the very month in which these representations were made. Its net profits that year amounted to over $20,000, and at the time the representations were made the plaintiff's share of the profits for the 11 months of the year then passed amounted to more than the $6,500 which she was finally prevailed upon to accept for her stock. At that time, instead of having to use its surplus to pay back debts, the company had owing to it from Betts not less than $11,000, and when he purchased the plaintiff's stock he took the necessary $6,500 out of the funds of the company to make the payment. The general album business of the company, while it had decreased, had by no means practically dwindled to nothing, but still continued in a very substantial amount. Neither was it true that the orders received from the Victor Company produced very little net .profit. On the contrary, they produced a large profit, and it was this branch of the company's business that yielded the profits that made its net earnings that year the greatest of any year in its history, and, in fact, much greater than for the entire period of its existence from the date of its incorporation in 1906 down to that time.

There are many features of the evidence that need not be gone into, such, for instance, as the acts of Betts in rewriting or causing to be rewritten various portions of the books of account of the company, and in destroying some of the original sheets thus rewritten, all or most of which was done after the company had gone out of existence, and for which no apparently adequate reason could be or was given by him. His explanation was that it was done to make the books look better. Without going at greater detail into the evidence, it is enough to say that I have no hesitation in finding that the condition of the company was misrepresented to the plaintiff by Wilcox, the agent of Betts, and that Betts knew of such false representations, and knew that they were false before the purchase was consummated, and, in any event, was chargeable with such false representations made by his agent in handling the transaction for him. Bennett v. Judson, 21 N. Y. 238; Garner v. Mangam, 93 N. Y. 642; Reynolds v. Leyden, 24 App. Div. 395, 48 N. Y. Supp. 1078.

[1] It may be conceded that Wilcox, who managed the factory, was not so familiar with the facts he assumed to give the plaintiff information about as was Betts, who had charge of the office; but that makes no difference, because he reported his conversations fully to Betts before the purchase was consummated, and even though the agent does not know that the representations he makes are false, the principal is none the less liable if he does know of the falsity of the representations made by his agent. Van Campen v. Bruns, 54 App. Div. 86, 66 N. Y. Supp. 344. This case in some of its main features is similar to Von Au v. Magenheimer, 126 App. Div. 257, 110 N. Y. Supp. 629, affirmed without opinion 196 N. Y. 510, 89 N. E. 1114,

although here the facts are stronger for the plaintiff. It would be well if the officers in charge of corporations, when about to purchase stock from their stockholders, could always have before them the forcible and salutary language that Mr. Justice Miller used in that case, viz.:

"I think a case of fraud and deceit was established. The defendants undertook to create the impression that the business of the company was not as profitable as it had been, and that unusual losses had been sustained since the last semiannual dividend had been declared; but the record shows that the company had never been more prosperous, and that any unusual loss was a matter of bookkeeping. It will not do to say that the statement that there had been heavy losses was literally true. The law does not suffer deceit to be practiced by any trick or device. The defendants at least owed the plaintiff the duty to speak the whole truth, if they spoke at all, not literally in words, but truthfully in substance. When they undertook to explain the condition of the company, they were bound not to deceive her, either by the suppression of the truth or by making statements which, though literally true, were calculated to deceive. They are to be judged by what they intentionally induced her to think, not by what they literally said. 126 App. Div. 260, 110 N. Y. Supp. 631. * * * While the wrong now being considered was not technically a deceit, its effect was to defraud the plaintiff, and, in respect of the remedy at least, should be treated as a fraud. It was a species of fraud; by the wrongful acts of the defendants the plaintiff was led to think that her stock was worth less than in fact it was, and we should not indulge in hair-splitting discriminations between that kind of deceit and a fraudulent misrepresentation or concealment respecting an existing fact, in view of the relations of the parties. If their relation was not strictly of the fiduciary character of trustee and cestui que trust, it was in a sense fiduciary; at least, the parties did not deal on equal terms. Indirectly, if not actually, the defendants were the agents or trustees of the plaintiff, for in truth the entity called the corporation but represents the stockholders. In law the two are distinct, as the stockholders own merely their shares, not the property of the corporation; but in fact each share represents a given interest in the property of the corporation. While the defendants did not have control of the plaintiff's shares, they had control of the property represented by said shares, and their management of that property affected the value of the shares precisely as though the corporate property and the shares were one and the same. The defendants were not under the disabilities of trustees in respect of dealings with a cestui que trust, but their superior position imposed upon them some duty to the plaintiff as well as to the corporation; at least, the duty not to take advantage of the opportunity afforded by their position to wrong her by any affirmative act designed to injure. Having the power to so manage the affairs of the corporation as to affect the value of her shares, they owed her the duty to refrain from intentionally abusing that power actually or apparently to depress the value of those shares for the purpose of acquiring them at an undervaluation." 126 App. Div. 267, 110 N. Y. Supp. 636.

In that case the court granted relief upon broad equitable principles, without pointing to explicit and affirmative false representations. Here we have, not only the same broad equitable principles, but we have the explicit affirmative false representations as well.

[2] On behalf of the defendant an attempt is made to show that the plaintiff does not come into court with clean hands, because she was attempting to purchase a judgment which was outstanding against Wilcox, intending, when she had turned the stock over to him after receiving the purchase price, to regain the stock at once under the judgment, thus obtaining both the money and the stock. What the effect, if any, of such an exercise of legal rights, would have upon her

standing in this suit, need not be considered, because before she consummated the sale she had learned that she could not acquire the judgment, and nevertheless proceeded to complete the transaction without it.

[3] It remains to determine what remedy should be afforded to the plaintiff. As the corporation has gone out of existence, there can be no recovery of the stock. The remedy she seeks, and that in my judgment she is entitled to, is a rescission of the sale, and the charging of the purchaser as a trustee ex maleficio, and holding him accountable for the proceeds of the stock thus acquired and all profits derived therefrom. The matter is of large importance to the plaintiff, because the corporation prospered surpassingly after her stock was sold; the net profits for the next fiscal year being about $53,000, after which time the corporation was dissolved by the defendant Betts and the business taken over and carried on by him personally. It is well established that one of the remedies available to a person who has been induced by false representations to sell property is to bring an equitable action to obtain a rescission of the contract, and to charge the purchaser as trustee ex maleficio upon an implied trust resulting from the fraud. Hammond v. Pennock, 61 N. Y. 145; Am. Sugar Refining Co. v. Fancher, 145 N. Y. 552, 40 N. E. 206, 27 L. R. A. 757; Converse v. Sickles, 146 N. Y. 200, 40 N. E. 777, 48 Am. St. Rep. 790. In Hammond v. Pennock, just cited, in speaking of the extent of the remedy in such cases the court said (page 156):

"Moreover, the wrongdoer, having made sales, holds the proceeds as a trustee ex maleficio; and the court gives the defrauded party title to the proceeds of sale, as far as they can be traced, and, as ancillary to the general relief, makes the wrongdoer account, in the character of trustee, for the proceeds which cannot be traced in the form of money."

In Jaffe v. Weld, 155 App. Div. 110, 139 N. Y. Supp. 1101, affirmed 208 N. Y. 593, 102 N. E. 1104, the court held that one who has been deprived of his property by fraud may, in case he can identify it or trace the proceeds derived from its sale, impress a trust upon it or the proceeds, whether in the hands of the wrongdoer or any person who takes title through him, unless it be in good faith and for value. The same principle was recognized in Lightfoot v. Davis, 198 N. Y. 261, 91 N. E. 582, 29 L. R. A. (N. S.) 119, 139 Am. St. Rep. 817, 19 Ann. Cas. 747.

There should be judgment for the plaintiff as above indicated, with costs. The requests submitted by the respective parties have been passed upon as indicated on the margins thereof. Submit for my signature, upon five days' notice of presentation, a complete decision, embodying all findings made by me, with proof of service on the other side.