EDWARD G. FISCHER, as Ancillary Administrator c. t. a. of the Estate of SARAH F. BARNES, Deceased, Appellant, *v.* GUARANTY TRUST COMPANY and ARTHUR B. LAWRENCE, as Executors and Trustees of the Estate of MAX LIPPMAN, Deceased, and Others, Respondents.

Second Department, March 18, 1940.

*Herman Bachrach* [*I. Bregoff, C. E. McGee* and *Edward G. Fischer* with him on the brief], for the appellant.

*Thomas I. Sheridan* [*Matthew Swerling* with him on the brief], for the respondents Guaranty Trust Company, etc., and others, and Lea R. Sachs, etc., and others.

*George W. Whiteside* [*Charles Pickett* with him on the brief], for the respondent Manufacturers Trust Company, as executor, etc., of Nathan I. Sachs, deceased.

ADEL, J.  The action is to recover damages on a claim that the plaintiff's intestate parted with certain shares of stock for a price lower than their value and that she was induced to do so by the fraudulent conduct of the defendant Wolf, one Max Lippman, deceased, one Nathan I. Sachs, deceased, and others who were not served in the action.

The proposition contended for by plaintiff is that a person, acting on behalf of a corporation director, who purchases stock from a stockholder of the corporation is liable for failure to disclose to the stockholder all the information he has as to the condition of the corporation, the value of its stock, and for whom the purchase is sought to be made.  It is contended that this is so whether or not the person makes fraudulent representations to the stockholder and even though the stockholder does not rely on anything stated by that person, but, on the contrary, makes his own investigation and, as a result thereof, determines upon an acceptable price for the stock.

It will be noticed that the proposition of law thus contended for is made up of several constituent propositions.  Thus it is claimed to be the law (1) that a director seeking to purchase stock from a stockholder must do more than refrain from making affirmative fraudulent representations and must disclose all the " inside information " he possesses; (2) that a person acting on behalf of a director is chargeable with knowledge that such is the law; (3) and because he is chargeable with the knowledge that that is the law he himself is under a duty to make known to the stockholder all that he knows about the corporation and the purchase before making the purchase for the director; (4) that it is no defense

that the stockholder expressly refrained from accepting information as to the condition of the corporation from the negotiator for the purchase but, on the contrary, relied on his own investigation before determining the price he would accept; and (5) that it is immaterial that the stockholder received for his stock the approximate price the stock was then commanding in the open market.

While I have thus stated in rather complex form the compound proposition of law contended for on this appeal, it should be observed that it is not the theory of action alleged in the complaint. That pleading alleges an action for damages for fraud and deceit, each of the five familiar elements of such an action appearing as an allegation. It is appellant's contention, nevertheless, that he should have been permitted to go to the jury on the theory now contended for, namely, breach of fiduciary duty.

The jury, after a ten-day trial, has found in favor of the defendants. The record is long, but I believe it is only necessary to set forth some of the evidence in order to make plain the transactions upon which the suit is based.

In 1921 or 1922 one Sarah F. Barnes, of Boston, purchased an interest in the Group No. 1 Oil Corporation and later received a certificate of stock for fifty-one shares. There is evidence that she purchased it for a trivial amount — merely to help a young man earn a commission on the sale. The stock certificate was placed in her vault in a Boston bank. In April, 1925, a Boston man called at the bank and stated to the bank manager that he was interested in acquiring Miss Barnes' stock; that the corporation was about to be placed into receivership; that he was willing to pay $200 a share for the stock, or he would sell all his stock to Miss Barnes at that price.

There is no doubt that this man had been sent by defendant Wolf,[1] who was a New York securities dealer, and that Wolf prompted him to make the offer for the stock. The fair inference from the evidence is that Wolf was acting at the instance of Max Lippman, but I doubt that there is evidence of participation by Nathan I. Sachs. Other circumstances would allow a finding that Lippman and Sachs, who were New York attorneys, were acting on behalf of one Krupp and one Pickrell. The latter two were the dominant spirits in the Texon Oil & Land Company. That corporation in turn owned a bare majority of the stock of the Group No. 1 Oil Corporation. Krupp and Pickrell were also directors of the Group No. 1 Oil Corporation. Sachs was a director in the Texon Corporation. Lippman and Sachs were attorneys for the corporations and for Krupp and Pickrell. For convenience I shall refer to Lippman and Sachs as " defendants." They are dead and their

representatives are parties defendant. I think it may be inferred from the facts proved that Lippman sought to purchase this stock from Miss Barnes for the ultimate benefit of Krupp and Pickrell. As to all the foregoing conclusions, however, the jury was free to find contrary to what I have stated. I do not think there is satisfactory evidence from which it could be found that either Lippman or Sachs benefited by the purchase of the stock.

On April 23, 1925, Miss Barnes' banker communicated to her the offer that had been made to purchase her stock. She thought it was a "fairy tale." (She probably had not kept herself informed of the operations of the corporation. For nearly a year previously Group No. 1 Oil Corporation's properties in Texas had been producing oil in large quantities.) But she was not deceived by the offer (and I do not mean to imply that the evidence requires a finding that such was the purpose of the offer). Miss Barnes thought it was peculiar that an offer to purchase the stock for $200 a share should be coupled with a statement of impending receivership. The effect was to put her on notice that the stock might be of value to someone, and she authorized a bank manager to investigate the possibilities of the stock. This representative, one Gladwin, came to New York in May, 1925, with the stock indorsed in blank, with instructions from Miss Barnes to sell it after he had exercised his judgment as to price. Gladwin inquired of one Skelly, an influential figure in the oil-producing industry, and received the opinion that the Group No. 1 Oil Corporation did not have good management. He inquired of a broker specializing in oil stocks and was told that the prospects of the company were a gamble. Gladwin's testimony was taken by commission in 1937, and his recollection of the 1925 transaction was not perfect at that time. He does not seem to have made any inquiry directly from the respondents or to have sought to examine the corporation's books. It is not clear just how far his investigation led him and how much he learned. We know now that it was a fact at that time that on the one hand the corporation was successfully producing large quantities of oil and on the other hand it was confronted with pending lawsuits which, if determined adversely, could have rendered the stock valueless. Certain it is that there is no persuasive evidence that any of the respondents made any fraudulent statements to Gladwin. After a week in New York, Gladwin sold the stock to Julius Lippman, a brother of the defendant Lippman. The evidence also shows that Gladwin knew of and had met the defendant Sachs.

The first offer made by Julius Lippman to Gladwin for the stock was about $200 a share. After negotiations the sale was con-

summated at $1,050 a share. The testimony of several dealers in oil securities shows that the over-the-counter market price of the stock was about the same, *i. e.*, around $200 a share on April 23, 1925, when the offer was first made for the stock, and over $1,000 a share around the time Gladwin sold it to Julius Lippman on May 25, 1925. In fact, one broker had a quotation of $1,050 a share on May twenty-seventh of that year.

Gladwin received $53,550 and returned to Boston. Miss Barnes accepted the money and made a gift of over $3,000 to Gladwin in appreciation of his efforts. The stock passed through the hands of dummy holders and within several months came into the control of the Texon Corporation. About six weeks after Gladwin made the sale the Group No. 1 Oil Corporation paid a dividend for the first time in its existence. It was a substantial dividend, $200 per share. That was in July. It paid a dividend every month, thereafter, so that by the end of the year it had paid a total of $1,650 per share in dividends. From July to December of that year the market price of the stock rose rapidly, and there were offers or sales of stock at prices ranging from over $1,000 a share to as high as $7,300 in one instance.

The news of the subsequent payment of dividends was widely publicized and Gladwin says he knew of it. He is not sure of his recollection, but he says he may have informed Miss Barnes concerning the dividends. About four years later Miss Barnes died. She had never complained of any injury resulting from the sale of her stock. After her death, and in 1929, her administrator was approached by one Cornelius J. Kelly with a proposition. Kelly was referred to the attorneys for the administrator. Kelly was an adventurer, interested in making a profit on a claim that Miss Barnes did not know that she had sold her stock in 1925 to insiders at a price lower than its value. Kelly was associated in the venture with one Noel Scaffa, a New York private investigator, and a Mr. Lewis, a Boston attorney. Both Kelly and Scaffa have been convicted of crimes. But to continue, the attorneys for the Barnes estate made an investigation of the claim, examined certain court records, but took no further action. Thereafter the Barnes estate was distributed and settled, and the administrator discharged.

Kelly, Lewis and Scaffa persisted in their efforts to prosecute the claim. They got in touch with one of the distributees of the Barnes estate, and succeeded in having a Massachusetts court appoint an administrator *de bonis non*. That representative received ancillary letters in Kings County Surrogate's Court, and this action was commenced by him as plaintiff. It is admitted that Scaffa paid the expenses of bringing the action, paid for the adminis-

trator's bond and selected the trial lawyer. Scaffa admitted that he is to receive sixty per cent of any recovery in this action. Lewis and Kelly are to receive ten per cent. It is not clear what the Barnes estate is to receive. In short, this is plainly what is known as a champertous venture.

The complaint names Krupp, Pickrell and others as defendants, but only the respondents were served. The recovery sought is a sum of money and to establish liens against the legacies in the Lippman and Sachs estates. The amount of the recovery sought is over $300,000, which is alleged to be the difference between the price paid to Miss Barnes and the value of the stock. Despite the prayer for both legal and equitable relief, the allegations of the complaint are clearly those of an action for the fraud and deceit alleged to have been committed by the defendants Wolf, Lippman, Sachs and others. The case was submitted to the jury on the theory alleged in the complaint and a verdict was returned in favor of respondents.

The plaintiff now contends that it was error to submit the case to the jury as one to recover for damages due to fraud and deceit, but that it should have been submitted on the claimed equitable theory that the above-named defendants breached the alleged fiduciary duty of disclosure.

There can be no doubt that a director of a corporation who is about to purchase stock from a stockholder should not be permitted to practice an active fraud upon the stockholder. Thus, if he deliberately misrepresents the condition of the corporation and its prospects he is liable for the damage caused by the misrepresentation. The courts are at variance as to whether or not a director, as to an individual stockholder, has the relationship of a trustee to his *cestui* when negotiating for the purchase of stock. In New York the relationship has been characterized as " in a sense fiduciary." (*Von Au* v. *Magenheimer*, 126 App. Div. 257; affd., 196 N. Y. 510.) That decision makes plain that the law will not permit a director to commit a deliberate, active fraud for the purpose of acquiring a stockholder's stock. It does not, however, stand for one of the propositions now contended for, namely, that the director, before he makes the purchase, must disclose to the stockholder all the information he possesses. Although there are some decisions which impose that duty on a director, the great weight of authority holds that the director who makes an offer to purchase the stockholder's stock has discharged his duty when he refrains from active wrongdoing. In *Saville* v. *Sweet* (234 App. Div. 236; affd., 262 N. Y. 567) the directors and officers acquired stock from the administratrix of the former president of the company. It was

a small company whose stock was not traded in anywhere and whose business was known only to the defendants. The opinion states that under those circumstances there was a duty on the part of the directors to disclose the real condition of the company to the plaintiff before purchasing her stock; but in that case it is to be noted that active fraudulent representations as to the condition of the company were made to the administratrix before she parted with her stock, upon which representations she relied and made no independent investigation.

The decisions on the subject have been exhaustively collated in 3 Fletcher's Cyclopedia of the Law of Private Corporations ([1931 ed.], § 1168 *et seq.*). I believe it will be found that in every instance where a director has been held accountable to the stockholder, in an action arising out of negotiations resulting in the purchase of his stock, not only the element of active fraud of the director existed, but the reliance of the stockholder thereon as the inducement to part with the stock also existed. Further, when the stockholder does not rely on the director, but on the contrary makes his own investigation and relies thereon as a means of determining price, it seems never to have been held that the director is liable for the consequences of the bargain. The situation as respects a director's or officer's duty to disclose information, upon inquiry by a stockholder, on the one hand, and the matter of the reliance or lack of reliance thereon by the stockholder, has been stated as follows (Id. § 1172): "* * * If the officer makes representations as to the value of the stock or as to the financial condition of the company or its future prospects, this, together with the then financial condition of the company, makes an issue of fact as to the fraud, which is properly submitted to the jury. If, however, the plaintiff in making the bargain did not rely upon the representation made to him by the defendant, but relied upon information obtained from other sources, he cannot claim that he has been defrauded by the defendant."

The New York decisions, so far as they touch the point, seem to be in accord. (*Carpenter* v. *Danforth*, 52 Barb. 581; *Stark* v. *Soule*, 45 Hun, 588; opinion printed in 9 N. Y. St. Repr. 555.) To sum up, then, on the matter of a director's purchasing stock from a stockholder: (1) There is a conflict of authority as to what relationship exists between the parties, with the greater weight holding that it is not that of a trustee, although it is of a confidential nature. (2) Under certain specific circumstances the director occupies such a relationship to the particular stockholder that he is bound to act somewhat as a trustee in making a purchase from his *cestui*. (3) No matter what the relationship is or may be termed, it has never been held that the director is accountable for

the proceeds of his purchase where the stockholder did not rely on the director in making the sale. In short, there is no absolute prohibition against a director's acquiring stock by purchase from a stockholder. And when the evidence shows that the stockholder not only placed no reliance on any act or statement of the director but, on the contrary, conducted his own investigation for the purpose of establishing an acceptable price, it follows that the director is entitled to purchase the stock without being called upon to account for any subsequent rise in the market price thereof.

So much for the law relating to the liability of the director himself. I believe, on the evidence in this case, that if Miss Barnes' had dealt face to face with one of the directors rather than with representatives of the defendants, she could not have rescinded the transaction for fraud, because she did not rely on the directors and because she obtained just about the market price for the stock in any event. If the directors are not liable, it follows for other and stronger reasons that those who negotiated the purchase on behalf of the directors are not chargeable with a breach of fiduciary duty or other tort.

I have pointed out that Miss Barnes during her life made no complaint; and after her death her original representative and his attorneys made an investigation but would not assert a claim of fraud or breach of duty against any one. It seems a lot to ask of the court to construe the law in such a way that there should be success in the action in favor of those indulging in champerty when the original party to the transaction was neither injured nor claimed injury. But I do not mean that the lack of good faith in bringing this action should influence its disposition if the claim be otherwise meritorious. On the merits, it would not seem to have been of great moment upon which theory the action was submitted to the jury, because in either event they could have found on the evidence that the situation was somewhat as follows: That Miss Barnes' representative, when he dealt with Julius Lippman, would have sold the stock for $1,050 even if he knew as much as any one could have known about the prospects of the company. The jury could have found that the frame of mind of Miss Barnes' agent at the time he made the sale was as follows: " I know that this stock has risen in price from about $200 to around $1,000 in the past month. Obviously, it has had a large rise. I know of the great prospects as to possibilities of earnings, but I have made my own inquiries and I also have my opinion of the management and the lawsuits that are pending. Possibly, now that this stock is on the upgrade, it will reach higher levels, but if it does, that is the fortune of the gamble. For my part, I will take advantage of the steep rise it has

had in the last few weeks, and I will turn the stock into more than $53,000 cash right now." The evidence wholly justifies such a finding, and if that is the fact, of course there was no injury to Miss Barnes from the viewpoint of an action at law for fraud and deceit or for breach of fiduciary duty.

The points with respect to errors and incidents of the ten-day trial, and to the verdict's being against the weight of the evidence have been exhaustively and soundly discussed in the respondents' briefs, and need not be repeated here. Suffice to say that in my opinion the verdict was not improperly induced, and the judgment entered thereon in favor of defendants should be affirmed, with costs.

The appeal from the order denying plaintiff's motion to set aside the verdict should be dismissed. There is no such order in the record.

LAZANSKY, P. J., JOHNSTON and TAYLOR, JJ., concur; CLOSE, J., concurs in the result.

Judgment unanimously affirmed, with costs.

Appeal from order denying plaintiff's motion for a new trial dismissed. There is no such order in the record.