LESNIK v. PUBLIC INDUSTRIALS COR-
PORATION (DAVISON et al., Third-
Party Defendants).

No. 377.

Circuit Court of Appeals, Second Circuit.

Sept. 7, 1944.

R. Randolph Hicks, of New York City (Satterlee & Warfield, of New York City, on the brief), for appellant Public Industrials Corporation.

David Haar, of New York City (Guy George Gabrielson, of New York City, on the brief), for appellees.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This action began as a simple suit on a promissory note; but, in line with the economy of judicial effort encouraged by the new civil rules, the defendant was able, by filing counterclaims and a cross-complaint against additional parties brought into the case, to go to trial on the issue of whether it was defrauded by a conspiracy of directors of a company in which it held stock to refuse to declare dividends, thereby causing it financial ruin. Since the judge took this issue from the jury for lack of evidence to prove the allegations, this appeal raises the issue whether the original defendant did succeed in establishing a prima facie case. In addition, there are important preliminary problems of venue and jurisdiction over cited-in defendants raised by the claims of appellees herein that the new parties could not be legally compelled to appear and defend in this action.

According to the facts substantially not in dispute, defendant-appellant, Public Industrials Corporation, a Delaware corporation engaged solely in the holding of corporate securities, was reorganized as of January 15, 1938, under former § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. Its unsecured debts amounted to some $21,000; its secured debts, to some $46,000. In all, there were four secured creditors, holding as security 1,782 shares of the 7% cumulative preferred stock of Hightstown Rug Company, a Delaware corporation having its principal place of business in New Jersey. By the terms of the reorganization, Public Industrials' assets, which consisted of 2,398 further shares of the Hightstown preferred stock, were placed in escrow to insure ratable distribution to all creditors; payment of unsecured creditors was postponed until Janu-

ary 15, 1941; and secured creditors received in exchange for outstanding evidences of indebtedness nonnegotiable 5% notes payable January 15, 1939, but extendible for one-year periods by the written consent prior to the due date of the holders of two-thirds the principal amount thereof. Since Public Industrials was not a going concern, the success of the plan and eventual payment of all creditors thus depended upon receipt of dividends from the Hightstown stock and extension from year to year of the secured indebtedness.

C. Herbert Davison was president of Hightstown and owner of over 80 per cent of its common stock, in which all voting powers were vested. With his attorney, Guy George Gabrielson, he also owned the balance over Public Industrials' holding of the 10,872 outstanding shares of preferred stock. Hightstown's board of directors consisted of Davison, Gabrielson, Albert L. Wolfe, a legal associate of Gabrielson, and two minority directors appointed by Public Industrials through an agreement with Davison. Although the annual statements for the years 1940, 1941, and especially 1942 showed earnings and surpluses [1] well in excess of the $76,000 necessary to declare a dividends on the preferred stock, no such dividends were declared from 1939 through 1942. The board did not discuss the matter at the annual meetings of March 11, 1941, and June 30, 1942, due to the failure of the management to have prepared any annual statements for the preceding years; but at a meeting on July 29, 1942, in consideration of the favorable annual statement for 1941, one of the minority directors asked why a dividend should not be declared. Gabrielson answered that the management would by no means consider it. Then at a meeting on February 4, 1943, after the prosperous report for 1942, the same director seems to have moved to declare a dividend. What transpired thereafter was held inadmissible at the trial below as occurring after the date of the filing of the complaint in the present action.

Receiving no dividends from the Hightstown stock, the required percentage of secured creditors of Public Industrials voted each year for three years to postpone the due date of their notes. On January 14, 1942, however, when the secured creditors were about to extend the notes for another year, Gabrielson, through a dummy, one Andrew J. Noe, entered into a contract with Equitable Building Corporation, holder of a note for $15,883.52, or over one-third the principal amount of Public Industrials' secured indebtedness, by the terms of which Equitable agreed, in return for a check for $24,000, to refuse to extend the time for payment of its note, due the following day, and if the note was not then paid, to sell the collateral, 472 shares of Hightstown preferred. If Noe bid in the stock at the sale, Equitable was to pay the purchase price out of the $24,000; and if the sale did not realize the full amount due Equitable on the note, Equitable was to retain the difference from the $24,000. Any balance was to be returned to Noe. Equitable duly blocked the extension of the notes, demanded and failed to receive payment, and sold the stock at public auction to Noe for $2,100, approximately $4.45 per share. Then on February 2, 1942, Harry Lesnik, plaintiff below and another dummy of Gabrielson and Davison, purchased from the Bank of New York for $11,500 a $10,000 note of Public Industrials, upon which some $14,000 principal and interest was at that time due and which was secured by 500 shares of Hightstown preferred. On February 17, 1942, Lesnik wrote Public Industrials to advise that he would sell the collateral at public auction the following week; and on February 25, 1942, he bought in the stock at the sale for $500, or $1 per share. He thereupon turned over both the note and the stock to Gabrielson. On November 30, 1942, Gabrielson and Lesnik entered into a written agreement whereby the former would return the note to Lesnik for purposes of suit to collect the balance remaining due, but which reserved all rights to the note and any balance collected in Gabrielson. Accordingly, Lesnik brought suit on the note on January 4, 1943, in the Supreme Court of the State of New York. Alleging diversity of citizenship, Public Industrials at once transferred the cause to the court below.

Public Industrials in its answer to the complaint set forth, among other things, three counterclaims. The first two were substantially similar and maintained that Lesnik, Davison, Gabrielson, and Wolfe had conspired, by refusing to declare dividends on the Hightstown stock when

---

[1] The book value of the preferred stock was in 1940 $112.37 per share, in 1941, $132.90 per share, and in 1942, $143.94 per share.

there were ample funds so to do, to wreck the plan of reorganization and to depreciate the value of the stock so that they could acquire Public Industrials' shares at a very low price. The third, after repeating the general allegations of conspiracy against Davison, Gabrielson, and Wolfe, went on to charge that they falsely informed Lesnik that he had power to sell the collateral received from the Bank of New York and that the resultant "fictitious and forced public sale" had destroyed the market value of Hightstown preferred, to Public Industrials' loss. As a result of these conspiracies, Public Industrials claimed damages of $400,000.

Thereafter Public Industrials moved to bring in Davison, Gabrielson, and Wolfe as defendants to the counterclaims, under Federal Civil Rule 13(h), 28 U.S.C.A. following section 723c; and this motion was first denied by the district court and a motion for reargument was also denied. Subsequently, upon renewal of this before another judge and with most extensive affidavits (which had not been presented before), it was finally granted in a written opinion dated April 30, 1943, 51 F.Supp. 989; and Gabrielson and Wolfe were thereupon duly served. Davison, however, was not then served. After they were served, Gabrielson and Wolfe sought an order vacating the service upon them, on the ground that it was in violation of the venue requirements of § 51 of the Judicial Code, 28 U.S.C.A. § 112, since they both were residents of New Jersey and Public Industrials was a Delaware corporation. This motion was denied by another district judge in a written opinion dated May 29, 1943, 51 F.Supp. 994. Then Gabrielson, Wolfe, and Lesnik moved for summary judgment on the counterclaims under Rule 56(b), asserting that the court had no jurisdiction, since decision of the counterclaims would involve delving into the internal affairs of a foreign corporation. This motion the same judge denied in a written opinion dated September 28, 1943. Trial was thereafter held before still another district judge and a jury, October 7 to 14, 1943, at the conclusion of which the court directed a verdict for plaintiff in the original action and dismissed the counterclaims of Public Industrials. Nearly three

months after this judgment was entered, Public Industrials succeeded in effecting service upon Davison, whose motion to quash the service was granted by the original district judge on January 14, 1944. This appeal is taken from this order and from the judgment entered by the trial judge.

As was inevitable, the failure of Hightstown to pay dividends on its preferred stock and the refusal of Public Industrials' secured creditors to extend the due date of their notes beyond January 15, 1942, caused a complete breakdown of the plan of reorganization for Public Industrials. The latter, therefore, filed a voluntary petition in bankruptcy in the Wilmington, Delaware, court on November 15, 1943, and received a stay against the enforcement of the judgment below. Thereafter Public Industrials seemingly secured a purchaser for its Hightstown stock at a price which would enable the payment of all creditors,[2] and requested of the Delaware court a dismissal of its petition in bankruptcy. Counsel for Lesnik vigorously opposed such action. So Public Industrials, through an advance from the intended purchaser of the Hightstown stock, tendered to him on April 15, 1944, the amount of the judgment below in Lesnik's favor. He refused to accept this tender, however, and the money was deposited with the Delaware court at Lesnik's disposal. Lesnik then petitioned us to dismiss the appeal from the judgment below on the original note, on the ground that the tender made the appeal moot. On May 5, 1944, we denied that the appeal was moot, but affirmed the judgment below on the note, stating that the tender showed the appeal to be without merit. The present appeal is thus only from the dismissal of Public Industrials' counterclaims and from the order quashing service against Davison.

To narrow the scope of our considerations yet further, we agree at the outset that the court below was justified in dismissing the third counterclaim. Its ambiguous phraseology appears to present the theory that Davison, Gabrielson, and Wolfe conspired with Lesnik to bring about an illegal sale of the collateral received upon purchase of Public Industrials' note from the Bank of New York. The record, however, is barren of proof that

2 Although not contained in the present record, we take judicial notice of these facts from the record before us upon our affirmance on May 5, 1944, of the judgment on the note. See Nahtel Corp. v. West Virginia Pulp & Paper Co., 2 Cir., 141 F.2d 1, 2; Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 426.

such sale was in fact illegal. Rather, it is clear that the sale or assignment of a secured indebtedness carries with it the assignor's rights in the security, which here included full powers of sale. Schram v. Sage, D.C.E.D. Mich., 46 F.Supp. 381, 383; Restatement, Security, 1941, § 29. Nor is there any merit to appellees' contention that the court below erred in failing to grant summary judgment in their favor. While the courts of one state unquestionably should not interfere in the internal management of a foreign corporation, Rogers v. Guaranty Trust Co. of New York, 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720; Cohen v. American Window Glass Co., 2 Cir., 126 F.2d 111, resolution of the present counterclaims would in no wise involve such an eventuality. Clearly this was not an action to force declaration of a dividend, as was the Cohen case, or performance by a corporation of its obligation to provide a sinking fund to redeem preferred stock, as in Nothiger v. Corroon & Reynolds Corp., 266 App.Div. 299, 42 N.Y.S.2d 103, affirmed 293 N.Y. 682, 56 N.E.2d 296, cited by appellees.

■ The rationale of the remaining counterclaims is that Davison, Gabrielson, and Wolfe fraudulently withheld dividends on the Hightstown preferred stock so as to acquire Public Industrials' holdings in the stock at ruinous prices, and that Lesnik joined in this conspiracy by purchasing the note held by the Bank of New York and forcing sale of the collateral at $1 per share. Under such circumstances, Lesnik was properly included as a member of the conspiracy, for persons joining and participating in a conspiracy at any time before the accomplishment of its ultimate objectives are equally liable with the originators. Nyquist v. United States, 6 Cir., 2 F.2d 504, certiorari denied 267 U.S. 606, 45 S.Ct. 508, 69 L.Ed. 810; United States v. Wilson, D.C.N.D.W.Va., 23 F.2d 112; Calcutt v. Gerig, 6 Cir., 271 F. 220; Rosco Trading Co. v. Goldenberg, Sup., 182 N.Y.S. 711; Meredith v. Art Metal Const. Co., 97 Misc. 69, 161 N.Y.S. 1, affirmed without opinion 176 App.Div. 949, 162 N.Y. S. 1131; cf. Original Ballet Russe v. Ballet Theatre, 2 Cir., 133 F.2d 187. Hence Lesnik himself cannot and does not object to the pleading of the counterclaims. But even as to the cited-in defendants, liable as coconspirators jointly and severally with Lesnik, Lewis v. Ingram, 10 Cir., 57 F.2d 463, certiorari denied 287 U.S. 614, 53 S. Ct. 16, 77 L.Ed. 533; Ellerd v. Griffith, 5 Cir., 22 F.2d 793, the trial of the issue of conspiracy once and for all here is obviously desirable and proper unless jurisdiction over them cannot be obtained or their joinder deprives the court of jurisdiction. Federal Rule 13(h); cf. Rule 13 (a). And as there was complete diversity of citizenship between Public Industrials and all the other parties, the codefendants are confined to their claims of improper venue and must concede the court's substantive jurisdiction over the counterclaims.

■ Since the adoption of the federal rules, it has been recognized that important provisions as to the addition of parties under Rules 13 (counterclaims), 14 (third-party practice), and 24 (intervention) may have limited effect if requirements of federal jurisdiction and venue are necessarily to be applied to all such parties just as though they were being originally sued by the plaintiffs in the actions. These rules are a part of that fundamental tenet of modern procedure that joinder of parties and of claims must be greatly liberalized to provide at least for the effective settlement at one time of all disputes of which parts are already before the court. They should, therefore, receive such favorable construction as is possible, consistent with due recognition of the settled principle that procedural rules cannot be used to extend federal jurisdiction or venue. Rule 82.

■ But jurisdiction is not extended by mere devices making possible more complete adjudication of issues in a single case, when based upon jurisdictional principles of long standing, even though the effectiveness of the new devices makes their use more frequent. Cf. Freeman v. Bee Machine Co., 319 U.S. 448, 454, 63 S.Ct. 1146, 87 L.Ed. 1509. Obviously a mere broadening of the content of a single federal action must not be confused with the extension of federal power; otherwise, such recognized steps as the union of law and equity or the free joinder of counterclaims would be dragged into the ambit of jurisdictional prohibitions, while actually they compress and desirably reduce the bulk and amount of federal litigation. Consequently the adding of parties under the rules has been viewed in the light of the ancient and well-established principle that a federal court has "ancillary" jurisdiction to complete adjudication of in-

terrelated matters where its jurisdiction has once been competently invoked. See cases collected, 1 Moore's Federal Practice 462-470; Dobie and Ladd, Cases on Federal Jurisdiction and Procedure, 1940, 336-346.

Now, however well settled may be the general principle of federal ancillary jurisdiction, nevertheless it is sufficiently uncertain as to its exact limits, or, as it has been put, "amorphous," 53 Harv.L.Rev. 449, 458, 40 Col.L.Rev. 148, 153, to afford justification for a considerable amount of desirable procedural reform. Hence the district courts and the commentators generally have supported joinder under all three of these rules (especially Rule 14 where most of the cases seem to arise) of at least issues closely related to the subject of the original suit, without new grounds of substantive jurisdiction.[3] Discussion as to venue, however, appears to have been much more limited, with the cases—outside of the present one and the closely similar case of United States, for Use and Benefit of Jones Contracting Co. v. Skilken, D.C.N.D. Ohio, 53 F.Supp. 14—confined to impleader under Rule 14, and rather divided as to whether the concept of "ancillary" jurisdiction can be used to make unnecessary venue qualifications beyond those required for the original action.[4] Hardly any of these cases have reached the appellate courts; perhaps the only appellate decisions which appear instructive are Williams v. Keyes, 5 Cir., 125 F.2d 208, certiorari denied 316 U.S. 699, 62 S.Ct. 1297, 86 L.Ed. 1768, holding the district court not ousted of jurisdiction when the defendants, after removing the action from a state court, impleaded other defendants residing in plaintiff's district; and United States, to Use and for Benefit of Foster Wheeler Corp. v. American Surety Co. of New York, 2 Cir., 142 F.2d 726, 728, affirming rulings set forth in D.C.E.D.N.Y., 25 F.Supp. 700, that an intervenor's counterclaim against a plaintiff for breach of the contract upon which plaintiff was suing needed no additional ground of jurisdiction to support it.[5] To similar effect is Johnson v. Riverland Levee Dist., 8 Cir., 117 F.2d 711, 714, 134 A.L.R. 326; and cf. Contracting Division, A. C. Horn Corp. v. New York Life Ins. Co., 2 Cir., 113 F.2d 864.[6]

---

[3] Cases as to impleader under Rule 14 are cited in 1 Moore's Federal Practice, 1943 Cum.Supp., 706-710, of which those cited in note 4, infra, are excellent examples; as to compulsory counterclaim, Rule 13(a), in Moore, op.cit. 680, 681, 690, and see, e.g., Carter Oil Co. v. Wood, D.C.E.D.Ill., 30 F.Supp. 875; Dewey & Almy Chemical Co. v. Johnson, Drake & Piper, Inc., D.C.E.D.N.Y., 25 F.Supp. 1021; and as to intervention under Rule 24 and counterclaims by intervenors, 2 Moore, 1943 Cum.Supp., 106, 107, 110, 111, and cf. cases cited below in text. The articles by commentators are already quite numerous, e.g., Holtzoff, Some Problems under Federal Third-Party Practice, 3 La.L.Rev. 408; Willis, Five Years of Federal Third-Party Practice, 29 Va.L.Rev. 981, citing many additional law review comments; Federal Jurisdiction in Third-Party Practice, 6 Fed.Rules Serv. 766; Shulman and Jaegerman, Some Jurisdictional Limitations on Federal Procedure, 45 Yale L.J. 393, 421.

[4] That venue requirements of the statute must be met as to third-party defendants, see extensive discussion in Lewis v. United Air Lines Transport Corp., D.C.Conn., 29 F.Supp. 112; King v. Shepherd, D.C.W.D.Ark., 26 F.Supp. 357, without discussing ancillary jurisdiction; and cf. Tullgren v. Jasper, D.C.

Md., 27 F.Supp. 413. Contra are Morrell v. United Air Lines Transport Corp., D.C.S.D.N.Y., 29 F.Supp. 757; Gray v. Hartford Accident & Indemnity Co., D. C.W.D.La., 31 F.Supp. 299; Id., D.C.W. D.La., 32 F.Supp. 335; and, as to Rule 13, United States, for Use and Benefit of Jones Contracting Co. v. Skilken, D.C.N.D.Ohio, 53 F.Supp. 14. The views of commentators (see note 3, supra) seem also divided.

[5] Citing Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750, 45 A.L.R. 1370, discussed below, which defines "transaction" as used in Equity Rule 30, 28 U.S.C.A. § 723 Appendix, and adding that had these rulings been made in an action brought after Federal Rules 13(a) and 24(a) took effect, their propriety would hardly have been questioned.

[6] Here in a suit for patent infringement, brought only by a nonexclusive licensee, we held a counterclaim for a declaration of invalidity against others properly dismissed for lack of proper venue; but that result followed because the original claim failed (and had been dismissed by plaintiff) for grounds other than on the merits, Kelleam v. Maryland Cas. Co., 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899; moreover, there is doubt whether the counterclaim was compulsory, Clair v. Kastar, Inc., 2 Cir., 138

In this connection it is important to note that, notwithstanding the general similarity of problems under these various rules, some present much more difficulty than others. Thus, the Advisory Committee, in suggesting various reasons for its proposed amendment restricting impleader under Rule 14(a) to persons liable to the defendant (striking out "or to the plaintiff"), calls attention to the question raised as to joinder or amendment of the plaintiff's claim to include a person he could not originally have sued. Preliminary Draft of Proposed Amendments to Rules of Civil Procedure, May, 1944, p. 29, citing cases and other authorities.[7] Our problem is thus one of the more limited ones in this field, involving not only the mere waivable privilege of venue, instead of substantive and constitutional jurisdiction, but also, as we shall now point out, a counterclaim which is compulsory, and thus must be heard in part at least (as affecting the original parties) in the pending action.

▮ A "compulsory counterclaim" under Rule 13(a) is a claim, not the subject of a pending action, which the defendant has at the time of its filing if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."[8] This rule is a broadening of former Equity Rule 30 to include "occurrence," as well as "transaction," and to apply to all civil actions, not merely to suits in equity. But the equity rule had been given a liberal interpretation in the interest of avoiding multiplicity of suits in Moore v. New York Cotton Exchange, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750, 45 A.L.R. 1370, where it was said: " 'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." This liberal view is now well established; thus, see United States, to Use and for Benefit of Foster Wheeler Corp. v. American Surety Co. of New York, supra, and 1 Moore's Federal Practice 682-684, 1943 Cum.Supp. 676-679, citing cases; and cf. Hancock Oil Co. v. Universal Oil Products Co., 9 Cir., 115 F.2d 45, supplemented 9 Cir., 120 F.2d 959, certiorari denied 314 U.S. 666, 62 S.Ct. 127, 86 L.Ed. 533; Home Ins. Co. of New York v. Trotter, 8 Cir., 130 F.2d 800; Clair v. Kastar, Inc., 2 Cir., 138 F.2d 828; Abraham v. Selig, D.C.S.D. N.Y., 29 F.Supp. 52.

▮ Under this view the counterclaims here may be viewed as arising out of the *occurrence,* and surely out of the *transaction,* by which Lesnik took the note upon which his complaint was based. Except for this, of course, and, indeed, as to outsiders who may have held the note, there would be no such interrelationship of the alleged conspiracy to the note to require its pleading in this action; but here the case is otherwise, since Lesnik took title to the note only as a step and a part in execution of the alleged conspiracy.[9] Hence proof of the conspiracy bears directly upon Lesnik's allegation of due and proper assignment of the note to him and should be here tried, to avoid multiplicity of suits and secure economy of judicial action. The compulsory counterclaim device is, of course, only a means of bringing all logically related claims into a single litigation, through the penalty of precluding the later assertion of omitted claims. See American Mills Co. v. American Surety Co., 260 U.S. 360, 43 S.Ct. 149, 67 L.

F.2d 828; Cresta Blanca Wine Co. v. Eastern Wine Corp., 2 Cir., 143 F.2d 1012.

[7] See, also, the concurring opinion of Minton, J., in People of State of Illinois, for Use of Trust Co. of Chicago, v. Maryland Cas. Co., 7 Cir., 132 F.2d 850, 853–855, and Thompson v. Cranston, D. C.W.D.N.Y., 2 F.R.D. 270, which was affirmed by us in Brown v. Cranston, 2 Cir., 132 F.2d 631, 148 A.L.R. 1178, certiorari denied Cranston v. Thompson, 319 U.S. 741, 63 S.Ct. 1028, 87 L.Ed. 1698, without passing directly on this issue of jurisdiction. Other cases dealing with the problem are cited in 1 Moore's Federal Practice, 1943 Cum. Supp., 707–709. Cf. O'Brien v. Richtarsic, D.C.W.D.N.Y., 2 F.R.D. 42, that impleader cannot be used to supply jurisdiction lacking to the original action. For other problems of this nature, see 53 Harv.L.Rev. 883, and the articles cited note 3, supra.

[8] It must also not require for its adjudication the presence of third parties (i.e., indispensable parties) of whom the court cannot acquire jurisdiction.

[9] The court below pointed out, 51 F. Supp. at page 992, how closely connected was the last counterclaim, alleging illegality in the sale of the collateral on the note; although we have approved of the dismissal of that counterclaim as an additional ground of damage, it serves to emphasize the close interconnection of all these matters.

Ed. 306; Marconi Wireless Telegraph Co. v. National Electric Signaling Co., D.C. E.D.N.Y., 206 F. 295. Here, had Public Industrials failed to plead its counterclaims attacking Lesnik's acquisition of the note in his suit on it, it ought not to be allowed to raise the matter later. Hence the counterclaim is compulsory and, therefore, fairly "ancillary" to the main action.[10]

Now there is no doubt that the older cases held the venue, as well as the substantive jurisdiction, of a true ancillary proceeding governed by the original proceeding; the greater doubt found by recent district judges in what seems the less important issue of venue is undoubtedly due to the natural absence of closely analogous cases before the days of modern procedural reform and the fact that the precedents did limit a true ancillary proceeding to one which grew rather directly out of the original action. There was a tendency to view substantive ancillary jurisdiction as depending on interrelation of the subject matter of the two proceedings; but the requirements of due process, if no other, would not allow the free institution of an independent claim, and particularly against independent parties,[11] without new or further service of process on the defendants. And the question whether there was new service of process on the party— as distinguished from mere service on counsel—appears in general to be the only one debated in this connection; indeed, until the change in the venue statute in 1887, such service was adequate in any event, since the defendant could be sued where "found." Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, 128 A.L.R. 1437.

Hence it seems quite clear that as concerns venue there are what may be termed "degrees of ancillarity." In a considerable class of cases, particularly where the ancillary proceeding was considered only a continuance of the original action, the venue of the latter governed; e. g., suits to enjoin actions at law in the same court, Story, J., in Dunlap v. Stetson, C. C. Me., Fed.Cas. No. 4,164; Freeman v. Howe, 24 How. 450, 460, 65 U.S. 450, 460, 16 L.Ed. 749; Eichel v. United States Fidelity & Guaranty Co., 245 U.S. 102, 38 S.Ct. 47, 62 L.Ed. 177; Cortes Co. v. Thannhauser, C.C.S.D.N.Y., 9 F. 226; Higgins v. California Prune & Apricot Growers, 2 Cir., 282 F. 550, 556 (cf. Id., 2 Cir., 3 F.2d 896, where this issue was not involved); or proceedings in civil contempt, Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 454, 52 S.Ct. 238, 76 L.Ed. 389; or bills of discovery, Baush Mach. Tool Co. v. Aluminum Co. of America, 2 Cir., 63 F.2d 778, certiorari denied Aluminum Co. of America v. Baush Mach. Tool Co., 289 U.S. 739, 53 S.Ct. 658, 77 L.Ed. 1486; Loft, Inc., v. Corn Products Refining Co., 7 Cir., 103 F.2d 1, 10, certiorari denied Corn Products Refining Co. v. Loft, Inc., 308 U. S. 558, 60 S.Ct. 80, 84 L.Ed. 469; cf. Simkin, Federal Practice, 3d Ed.1938, 587. But a change in the nature and the basis of the relief, so as to make the new proceeding independent of the old, would make new service of process necessary. G. & C. Merriam Co. v. Saalfield, 241 U.S. 22, 36 S.Ct. 477, 60 L.Ed. 868; Pacific R. R. v. Missouri Pac. R. Co., 111 U.S. 505, 522, 4 S.Ct. 583, 28 L.Ed. 498; Mexican Ore Co. v. Mexican Guadalupe Mining Co., C. C.N.J., 47 F. 351, 355; Manning v. Berdan, C.C.N.J., 132 F. 382. These cases, however, neither in terms nor, as we believe, by analogy suggest or compel the answer to our problem.[12]

---

[10] It seems to be accepted that a permissive counterclaim, or one unconnected with the transaction out of which the claim sued on arises, is not ancillary and requires independent grounds of jurisdiction. Cf. Barber Asphalt Corp. v. La Fera Grecco Contracting Co., 3 Cir., 116 F.2d 211; Isenberg v. Biddle, 75 U. S.App.D.C. 100, 125 F.2d 741; 1 Moore's Federal Practice 695–699, 1943 Cum. Supp. 683, 684.

[11] While the principle of ancillary jurisdiction applied whether the new proceeding was a part of the original one or was independent thereof, it is indicated that it probably must be in the same district as the original one. Mitch-

ell v. Maurer, 293 U.S. 237, 243, 55 S.Ct. 162, 79 L.Ed. 338; cf. Kelley v. Queeney, D.C.W.D.N.Y., 41 F.Supp. 1015, 1018.

[12] There has been a tendency to consider these cases dealing with service of process as concluding the question of venue. Cf. Lewis v. United Air Lines Transport Corp., supra, which relied explicitly on G. & C. Merriam Co. v. Saalfield, supra. In 2 Cyc.Fed.Proc., 2d Ed., 581–584, the author, in addition, relies on what is hardly more than a passing reference to the venue statute by Mr. Justice Miller in requiring service of process in Pacific R. R. v. Missouri Pac. R. Co., C.C.E.D.Mo., 3 F. 772, which is generally approved on this point in Pacific R. R.

In addition to the form of the venue statute until 1887, other factors limited the occasion for more specific consideration of matters enlightening on our question. Thus it came to be settled that a plaintiff against whom a counterclaim, even a permissive one, was filed could not plead venue. General Electric Co. v. Marvel Rare Metals Co., 287 U.S. 430, 53 S.Ct. 202, 77 L.Ed. 408. Perhaps even more significantly, the Court tended to read the venue statute strictly according to its language, which applies to a "civil suit" brought against any person "by any original process or proceeding." 28 U.S. C.A. § 112; Alexander v. Hillman, 296 U. S. 222, 240, 56 S.Ct. 204, 80 L.Ed. 192. In this connection it is desirable to note particularly the contrasting language of the same statute that, save for the special statutory exemptions, *no person* "shall be arrested in one district for trial in another, in any civil action before a district court," thus making that privilege applicable in any civil suit, and not limited to the time of bringing suit. Moreover, this statute does not apply to removed actions which are subject to the provisions of Judicial Code, § 28, 28 U.S.C.A. § 71; Freeman v. Bee Machine Co., supra. In consequence, the venue statute may apply to the present removed action only in so far as the counterclaims are to be considered a new civil suit brought by original process.

In this status of the precedents, we think that the problem is new and not controlled by precedents, which may not be held to do more than emphasize the necessity of a very close interrelationship of the original and the ancillary proceeding. We are, therefore, justified in relying on the literal terms of the venue statute, which in effect emphasizes the same thing by applying only to a civil suit commenced by original process. Here we think the necessary relationship between the counterclaims and the original claim too close to allow these defendants the benefits of Judicial Code, § 51, as though a new action were involved. They have already had the protection of being "arrested" within the district, and without more precise statutory basis should not be held entitled to more at the high price of the multiplicity of suits which must result. Had the statutory principle and purpose been fully applicable, their opponent would have been entitled to first choice and might have chosen its own district as the locus of suit. This choice was defeated by action of the codefendants' agent and representative for the purpose of suit, in bringing it in the New York state court. The object of the venue statute is to meet somewhat the convenience of the parties and their witnesses by localizing disputes to places convenient to at least some of the persons in interest; but this dispute, already localized in the Southern District of New York, is more properly and conveniently disposed of if it be carried to complete settlement there than if a part of it is now required to be started anew in the District of Delaware or the District of New Jersey. Compare Morrell v. United Air Lines Transport Corp. and United States, for Use and Benefit of Jones Contracting Co. v. Skilken, both supra; 1 Moore's Federal Practice, 1943 Cum.Supp., 690, 708-710.

The court below dismissed the counterclaims on the merits on the ground of failure of proof. We think this was error and that the evidence presented a question of fact for the jury as to the existence and extent of the conspiracy. The relationship between a stockholder in a corporation and the members of its board of directors is "in a sense fiduciary," Von Au v. Magenheimer, 126 App.Div. 257, 110 N.Y.S. 629, 636, affirmed without opinion 196 N.Y. 510, 89 N.E. 1114; and "the law will not permit a director to commit a deliberate, active fraud for the purpose of acquiring a stockholder's stock." Fischer v. Guaranty Trust Co., 259 App. Div. 176, 18 N.Y.S.2d 328, 333, reargument denied In re Barnes' Estate, 259 App.Div. 888, 20 N.Y.S.2d 409, affirmed 285 N.Y. 679, 34 N.E.2d 379. While this case shows that New York has not adopted the strict rule of absolute disclosure by a director purchasing stock, it has adopted the intermediate or "special facts" rule, which, among other things, prevents active concealment, as well as active fraud, by a director. Cf. Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853; 11 Wis.

---

v. Missouri Pac. R. Co., 111 U.S. 505, 522, 4 S.Ct. 583, 28 L.Ed. 498. But we doubt if this reference adds anything more to the general rules discussed in the text requiring service of process in

this type of case; for reasons stated, we do not think these rules settle the question of venue. Note that Mr. Justice Brandeis does not even mention venue in Mitchell v. Maurer, supra.

L.Rev. 547; 9 Miss.L.J. 427, 443-454; 27 Yale L.J. 731; cf. 32 Yale L.J. 637.

Directors have been held individually liable for conspiring to depreciate stock held in pledge by them, Ritchie v. McMullen, 6 Cir., 79 F. 522, certiorari denied 168 U.S. 710, 18 S.Ct. 945, 42 L.Ed. 1212, and for conspiring to coerce a stockholder to sell his stock at a low price by fraudulently withholding dividends, as in the present case. Von Au v. Magenheimer, supra. As stated in the Von Au case, which seems a direct precedent here, directors are at least under the duty not to take advantage of their superior position by doing any affirmative act designed to injure a stockholder. 126 App.Div. at page 267, 110 N.Y.S. 629. See, also, Walsham v. Stainton, Ch.App., 1 De G. J. & S. 678; Schafuss v. Betts, 94 Misc. 463, 157 N.Y.S. 608, 610, 611, affirmed without opinion 175 App.Div. 893, 160 N.Y.S. 1145; Kono v. Roeth, 237 App.Div. 252, 260 N.Y.S. 662, reargument denied 238 App. Div. 775, 261 N.Y.S. 1048. If Davison, Gabrielson, and Wolfe intentionally withheld dividends here for the purpose of breaking up the Public Industrials reorganization and acquiring the Hightstown stock, it would surely be such an affirmative act for which they must be held liable; and if Lesnik later joined in to further the ends of the conspiracy, he would, as we have seen, be jointly liable with the others.

Concededly there is a broad discretion in the directors of a corporation regarding the declaration of dividends; and Gabrielson presented an explanation, quite possibly convincing to the trier of facts, as to why Hightstown declared no preferred dividends in the years in question. He stated in substance that no dividends were declared from 1939 through 1941 because the company still owed money to the banks and on its funded indebtedness at that time, and that the large profits and surplus of 1942 had to be reserved for the building up of the company's depleted inventory after the war. But these factors are not in themselves decisive or final as a matter of law. It is beyond dispute that Davison, Gabrielson, and Wolfe, using Noe and Lesnik as dummies, did, after learning that Public Industrials' secured creditors were about to extend the due date of the notes until January 15, 1943, plan to acquire secretly the Hightstown shares which stood as collateral for two of the notes. They achieved this end in such a manner that they substantially broke up the reorganization and received a bonanza for themselves in the shape of stock with a book value of approximately $144 per share for $1 and $4.45 per share. Indeed, the fact that they paid full value for the notes shows that the stock was worth far more than that. Meanwhile Hightstown was prospering, and the management seems to have concealed the true situation of the company from Public Industrials' two minority directors at least until late in 1942. Such eventualities are more than sufficient to cast doubt upon the motives of Davison, Gabrielson, and Wolfe in failing to declare dividends, and raised a question of fact for the determination of the jury.

We think, therefore, that the action must go back for a trial of the issues presented by the counterclaims. The affirmance of the judgment on the note made by us on May 5, 1944, however, will stand; the note represents a debt validly contracted and should be discharged. This is without prejudice to any action the district court may see fit to take to stay the execution of this judgment until the termination of the entire action. We have held that the trial court properly dismissed the third counterclaim; but we think reversal should go to the entire judgment on all the counterclaims, in order to avoid any contention of res judicata as to a part of the claim and any doubt as to the power of the court to permit repleading of these various counterclaims to state the facts relied on succinctly and directly in a single counterclaim. On the same principles upon which we have held Gabrielson and Wolfe properly joined as third-party defendants in this action, Davison was likewise subject to suit as soon as he was served; the order quashing service as to him is, therefore, reversed, so that he may make his defense along with the others at the retrial. We think, too, that the court was in error in excluding evidence as to the condition of the business in 1943, after the bringing of the original action on the note, but before the filing of the counterclaims. The conspiracy charged was a continuing one; and evidence to prove it or to fix the amount of injury was properly admissible as long as it continued, while the counterclaim, under Rule 13(a), covered claims which the pleader had "at the time of [its] filing," and might even cover later claims by permission of the

court, under Rule 15(a); cf. 1 Moore's Federal Practice 684, 718-721, 812.

Judgment and order reversed, and action remanded for proceedings in accordance with this opinion.